# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-1707

VALENTINA MITREVA, et al.,

*Petitioners,*

v.

ALBERTO GONZALES,

*Respondent.*

_____

On Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A79 562 008, 009, 010, & 011

_____

ARGUED MAY 31, 2005—DECIDED AUGUST 8, 2005

_____

Before EASTERBROOK, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Valentina Mitreva, a Bulgarian and ethnic Rom (gypsy), applied for asylum on account of her nationality based on her participation in a rally for Romani equality that led to a confrontation with the police. The Immigration Judge (IJ) denied the application, which Mitreva's family joined, and the Board of Immigration Appeals (BIA) affirmed. The Board found that Mitreva failed to establish a nexus between the harm she suffered and a protected ground, and that she did not have a well-founded fear of future persecution because she could not

prove that Bulgarian Roma are the victims of a pattern and practice of persecution. Mitreva petitions for review of the Board's order. We deny the petition and affirm the Board's judgment.

Mitreva's petition includes claims of persecution based on employment discrimination, as well as several incidents of harassment during her childhood, but her most serious charges stem from a police interrogation. In November 1999 Mitreva participated with her parents and sister in a rally for Romani equality at the city hall in the town of Kresna. Between 30 and 50 other Roma attended. The next day Mitreva received a subpoena to appear at the Kresna police station. She reported as requested, and was accused by investigators of burglary. The investigators called her a "black gypsy" and a "dirty bitch," and aggressively pressed her to sign a confession. When she refused, an officer grabbed her by the hair and slammed her face on the edge of a table, drawing blood. The interrogation ended, and Mitreva was taken to a hospital where she was treated for a 1.5-centimeter cut on her forehead.

For the next two or three months, Mitreva received "a series of telephone calls" threatening that if she revealed "what happened in the police station," she would be killed. Then, in June 2000, she was "attacked by two people with masks" while walking home from an aunt's house. One assailant struck her on her head and the other pinned her arms behind her back, yelling, "Don't try to run you dirty gypsy. Now you will pay for everything!" Mitreva recognized the man's voice as the same she had heard in the telephone threats, and she screamed loudly. This attracted the attention of nearby residents, who turned on the lights of their house, scaring the attackers away. Rattled by the incident, Mitreva moved in with her mother-in-law in a nearby village and left for America in August. There she learned by letter from her sister that the threatening phone calls continued back in Bulgaria. Her sister also wrote that

in an apparently unrelated incident, her grandmother had died several weeks after being shoved by two men who brusquely passed her in the road, saying, "get [out] from our way, uh, old gypsy."

The IJ denied the asylum application, finding Mitreva's narrative credible but ruling that she had not demonstrated that her Romani ethnicity was related to the mistreatment she had suffered or the persecution she feared if returned. The BIA affirmed in a separate opinion. The Board agreed that Mitreva had failed to establish a nexus tying her misfortunes to her ethnicity, stating that the violent interrogation, subsequent phone calls, and attack appeared to be based on a criminal investigation and an effort to cover up the abusive officer's behavior. The Board also *sua sponte* raised and rejected the possibility that Mitreva might demonstrate a well-founded fear of future persecution by showing that Roma face a pattern and practice of persecution in Bulgaria, *see* 8 C.F.R. § 208.13(b)(2)(iii), noting that anti-Roma discrimination is largely practiced by private actors. To support this point, the Board observed that the Bulgarian government has launched several initiatives to combat anti-Roma discrimination.

In this petition Mitreva first challenges the Board's determination that she failed to demonstrate that the harm she suffered was "on account of" her Romani ethnicity.[1] She contends that she proved her interrogators' anti-Roma motives by showing that she was issued a subpoena immediately after the Romani rights protest, and that she and another Romani demonstrator were singled out as leaders

---

[1] Mitreva had earlier argued that she and her husband were also persecuted because of his political opinion—he is a member of a Macedonian rights organization called UMO-Ilinden. However, she abandons this argument on appeal and focuses solely on her Romani ethnicity.

because they were the only protesters who were educated and held posters. Mitreva also argues that her interrogators' and attackers' use of anti-Roma ethnic slurs proves that they mistreated her because of her ethnicity.

It is true that the issuance of the subpoena so soon after the Romani protest *could* support the inference that the interrogation was prompted by Mitreva's ethnicity, and not an alleged burglary. But this is not the only conclusion the Board was entitled to reach, and under the deferential substantial evidence test, reversal is warranted only if the evidence *compels* a different outcome. *Ciorba v. Ashcroft*, 323 F.3d 539, 544 (7th Cir. 2003); *Petrovic v. INS*, 198 F.3d 1034, 1037 (7th Cir. 2000). Mitreva's parents and sister attended the rally as well, and they were not summoned. Mitreva's explanation that she was singled out because of her poster and her university education only goes so far: her affidavit discloses that she and her parents together held the poster, so that would not have distinguished her or suggested that she was a leader. Thus the only explanation for summoning Mitreva and not her family is that she had a better education; this point is not so convincing as to meet her high burden of providing evidence that would convince any reasonable factfinder that the policemen were motivated by her ethnicity.

Similarly, although the use of ethnic slurs by the interrogators and Mitreva's assailant could support a finding that she was mistreated because of her ethnicity, the record does not compel that conclusion. When a persecutor utters an ethnic slur during an encounter that appears to be motivated by other factors, the slur does not necessarily prove a nexus to a protected ground. *See Lie v. Ashcroft*, 396 F.3d 530, 535-36 (3d Cir. 2005). Here, the BIA was permitted to conclude that because the officers appeared to be investigating a burglary, their use of an epithet does not prove that they were harassing Mitreva because she was a Rom. And the Board reasonably found that her attacker,

who called Mitreva a "dirty gypsy," was in league with the police officers in an effort to cover up the malfeasance during the interrogation, not to attack Roma. Again, although we might reach a contrary conclusion on this evidence, a reasonable factfinder could disagree.

Mitreva next argues that the Board erred by finding that the anti-Roma discrimination she suffered as a child does not amount to persecution. We agree with the Board's conclusion. The incidents from Mitreva's childhood—a child's toy set on fire in her family's backyard when she was eight years old and several incidents in which street toughs threw rocks through her family's windows—are better characterized as harassment and discrimination than persecution. Neither she nor her family suffered any harm, *Nagoulko v. INS*, 333 F.3d 1012, 1016-17 (9th Cir. 2003), and threats amount to persecution only in the most extreme circumstances, *Mousa v. INS*, 223 F.3d 425, 430 (7th Cir. 2000). Moreover, there is no evidence that the government either participated in or condoned these acts of private discrimination. *See Hor v. Gonzales*, 400 F.3d 482, 485-86 (7th Cir. 2005).

Mitreva also contends that the Board underestimated the severity of the race-tinged economic discrimination she suffered: she was dismissed from her first job on accusations of theft and had a difficult time finding a new job. Again, if there is an anti-Roma undercurrent to this, no evidence suggests that the discrimination was perpetrated or tolerated by state actors. Moreover, we agree with the Board that the acts themselves are not severe enough to constitute persecution. An individual who earns a degree and finds work has no claim of economic persecution, *Bucur v. INS*, 109 F.3d 399, 402 (7th Cir. 1997), nor does one who fails to find a job unless she can prove that the hardship was deliberately imposed, *Boykov v. INS*, 109 F.3d 413, 417 (7th Cir. 1997). Mitreva found a job soon after earning her degree, and although she believes she was later fired

because a bigoted co-worker framed her, no evidence supports this contention. Moreover, she found a replacement position less than two years later.

Unable to show past persecution, Mitreva faces a high burden in demonstrating that she has a well-founded fear of future persecution if returned to Bulgaria. *See* 8 C.F.R. § 208.13(b)(1). She failed to point to facts that she personally will be singled out for persecution, so she contends, under § 208.13(b)(2)(iii), that there is a pattern and practice in Bulgaria of persecuting Roma. For support, she points to human rights reports in the record by the State Department, Human Rights Watch, and Amnesty International discussing anti-Roma discrimination and abuse committed by both private actors and the Bulgarian security services.

Although § 208.13(b)(2)(iii) does not specify the circumstances under which country conditions become so severe as to create a pattern and practice of persecution, we have stated that persecution of a protected group must be "extreme" before it reaches this level. *Capric v. Ashcroft*, 355 F.3d 1075, 1095 (7th Cir. 2004); *see also Hoxha v. Ashcroft*, 319 F.3d 1179, 1183 n.6 (9th Cir. 2003). There must be a "systematic, pervasive, or organized" effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetrated or tolerated by state actors. *See Lie*, 396 F.3d at 537; *Ngure v. Ashcroft*, 367 F.3d 975, 991 (8th Cir. 2004). Thus, we have rejected claims of a pattern and practice of persecution of ethnic Albanians in Montenegro during the Balkan wars in the 1990s, *see Pelinkovic v. Ashcroft*, 366 F.3d 532, 539-40 (7th Cir. 2004) (Montenegrans faced less severe harm than Kosovar Albanians); *Capric*, 355 F.3d at 1094-95 (same), and of Ahmadi Muslims in Pakistan, *Ahmad v. INS*, 163 F.3d 457, 463 (7th Cir. 1999). Other circuits have found persecution per se only where there was widespread violence toward the group in question, such as Afghanistan's policy of executing apostates, *Ahmadshah v. Ashcroft*, 396 F.3d 917, 921 (8th

Cir. 2005), and the Indonesian government's failure to prevent scores of attacks on Christian churches, which led to thousands of deaths and displacements, *Eduard v. Ashcroft*, 379 F.3d 182, 192 (5th Cir. 2004). *Cf. Pieterson v. Ashcroft*, 364 F.3d 38, 44 (1st Cir. 2004) (mere discrimination and harassment of Sierra Leone's Creoles insufficient to show a pattern and practice of persecution); *Woldemeskel v. INS*, 257 F.3d 1185, 1191 (10th Cir. 2001) (imprisonment, harassment, and employment discrimination against Ethiopia's Ahmara not severe enough to show a pattern and practice). The rationale behind this standard is simple. Since every member of a group that faces per se persecution is a refugee eligible for a discretionary grant of asylum, courts have interpreted the regulation to apply only in rare circumstances, to prevent an avalanche of asylum-seekers.

Substantial evidence supports the Board's conclusion that Bulgarian Roma do not suffer persecution per se. It is beyond question that their lot is unpleasant: the human rights reports in the record show that Roma are attacked by private citizens, arrested arbitrarily and beaten by police officers, and discriminated against by employers. But the State Department's most recent country report indicates that although acts of discrimination in employment and daily life are still a problem in Bulgaria, anti-Roma violence is declining. "There were no reports of lethal police assaults on Roma" in 2003, and although there were several incidents of police harassment of Romani detainees, these appear to have been isolated. The most serious assaults were committed by private individuals.

This leads to another point supporting the Board's decision: given the Bulgarian government's serious efforts at reform, the Board was entitled to conclude that the persecution Roma face is not perpetrated or tolerated by state actors. *See Kotasz v. INS*, 31 F.3d 847, 854 & n.12 (9th Cir. 1994) (rejecting claim of persecution per se of Hungarian Roma where government was attempting to remedy hostil-

ity). The government has created a number of initiatives to ease the plight of the Roma population, including a "Program for Social Integration of Roma," an affirmative action policy, an "Ethnic Integration and Conflict Resolution" project, and a program to provide housing for displaced Roma. Several of these programs have borne fruit, and a new anti-discrimination statute was successfully invoked in five out of six cases brought by Roma in 2003. These efforts, coupled with the reduced level of anti-Roma violence in Bulgaria, provide substantial evidence for the Board's decision.

Finally, Mitreva challenges the Board's denial of her claims for withholding of removal and relief under the Convention Against Torture. The latter she has waived by failing to seek that relief before the Board, and the former entails a higher showing than a successful claim of asylum, and therefore also fails. The petition for review is DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*