In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3023

SOULEYE ABDOULAYE,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney
General of the United States,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A095 869 507

ARGUED JANUARY 15, 2013 — DECIDED AUGUST 1, 2013

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Souleye Abdoulaye petitions for review of a decision of the Board of Immigration Appeals (BIA) rejecting his petition for adjustment of status, asylum, and withholding of removal under 8 U.S.C. § 1231 and the Convention Against Torture (CAT). The Board based its action on a finding that Abdoulaye's participation in a 2002 military

mutiny in his home country of Niger amounted to "terrorist activity" within the meaning of the Immigration and Nationality Act (INA) and thus rendered him ineligible for any form of relief. The Board also denied Abdoulaye's request for deferral of removal under the CAT, because he failed to show that it was more likely than not he would be tortured if returned to Niger, and Abdoulaye challenges that conclusion. Because we conclude that the Board's decisions on both points were supported by substantial evidence, we deny the petition for review.

**I**

**A**

Abdoulaye is a native and citizen of Niger who entered the United States on a nonimmigrant visa on August 1, 2002. Several months after his arrival, Abdoulaye (with the assistance of counsel) filed an application for asylum, withholding of removal, and protection under the CAT. In a written statement accompanying that application, Abdoulaye stated that he fled Niger because he feared "being sentenced to death or killed due to [his] planning of a military mutiny" that was planned and executed in late July and early August of 2002. Abdoulaye explained that he was a corporal in the Nigerien military and a supporter of the *Rassemblement Démocratique pour le Progrès* (RDP), a left-wing political party loyal to former President Ibrahim Baré Maïnassara. Following Baré's death in a 1999 coup, Abdoulaye and other RDP supporters in the military were transferred to the remote town of Diffa, apparently as punishment for their loyalty to the ousted Baré.

In July 2002, RDP-affiliated soldiers in Diffa hatched a plot to mutiny in order to protest low wages and poor conditions and to demand reform. The plot included plans to seize the regional governor of Diffa and several other officials "to demand our rights for better living conditions." At multiple points in his asylum application, Abdoulaye identified himself as an organizer of the mutiny, stating (among other things): "I was one of the organizers of this mutiny," "I ordered others to carry out the actions of this mutiny," and "I participated in the writing of a statement that was sent to the government with our demands which all the organizers signed." Abdoulaye further noted that in the weeks leading up to the mutiny he obtained two visas—one for Belgium and the other for the United States—in anticipation of needing to flee Niger in its wake.

The mutiny began on July 31. Several hundred soldiers in Diffa rose up, seized the regional governor and six other officials, and took over the town, erecting barricades and imposing a curfew on residents. According to news reports, the mutineers demanded five months' back pay, the dismissal of the military's chief of staff, and a meeting with the prime minister. The mutiny was suppressed several days later when, following a brief skirmish in which two people were killed, government troops retook the town.

Abdoulaye was no longer in Niger when the mutiny took place. In his statement, he reported that he received word on July 25 that the government had plans to arrest the mutiny's organizers, and based on that warning, he and six other organizers fled to Nigeria. While several of his co-organizers chose to seek asylum in Belgium, Abdoulaye made his way to

the United States, arriving in New York at the beginning of August. He fears that if he is returned to Niger he would be arrested and either held without trial, sentenced to death by a military tribunal, or perhaps simply killed.

B

Abdoulaye attended an asylum interview in December 2002; in May 2007, the asylum officer referred his case to an Immigration Judge (IJ). (The record does not reveal the reason for the five-year delay.) After several continuances, the hearing on the merits of Abdoulaye's application commenced on February 5, 2009, by which time Abdoulaye had added an application for adjustment of status based on his marriage to a U.S. citizen. The hearing quickly focused on Abdoulaye's role in the 2002 Diffa mutiny and specifically on whether his actions amounted to "terrorist activity" as that term is defined by 8 U.S.C. § 1182(a)(3)(B). When it became clear that Abdoulaye's counsel was not prepared to address this issue, the IJ continued the hearing until November 12.

At both the February and November hearings, Abdoulaye insisted that his role in the mutiny was very minor. He emphasized that he was merely a corporal and thus not in a position to lead or give orders. He claimed that he intended only to participate in the mutiny, just as hundreds of his fellow soldiers had done. He denied having any significant role in planning the mutiny and stated that he was following orders from his superiors. Abdoulaye further objected to the characterization of the mutiny as a violent uprising, arguing that it was more akin to a peaceful protest. He maintained that he and his fellow mutineers did not even have weapons. He also

denied that the governor or others had been taken hostage; rather, as he understood it, the soldiers had done no more than to speak to the governor. When presented with news reports that gave a contrary account of the mutiny, Abdoulaye suggested the reports were inaccurate and pointed out that, in any event, he had fled Niger before the actual mutiny. Abdoulaye additionally disputed the accuracy of a Nigerien government document (even though he had submitted it) that listed him as one of six organizers of the mutiny. He suggested that the document listed him as an organizer only because the government did not know his whereabouts.

Abdoulaye explained the discrepancies between his testimony to the IJ and the statements made in his original asylum application as the product of mistakes made in translating his written statement from French into English. He asserted that he was only about 30% proficient in French, suggesting that this too could account for inaccuracies in his asylum application. He made the latter argument notwithstanding the fact that he had consistently listed French as his native language and relied on a French interpreter throughout his immigration proceedings up until his final appearance before the IJ in November 2009.

After considering the evidence, the IJ concluded that Abdoulaye's role in the mutiny fell within the statutory definition of "engag[ing] in a terrorist activity." Section 1182(a)(3)(B)(iii)(II) defines terrorist activity to include the following:

> seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to

compel a third person (including a governmental
organization) to do or abstain from doing any act as
an explicit or implicit condition for the release of the
individual seized or detained.

The IJ observed that the Diffa mutineers' seizure of the
regional governor in order to demand changes in government
policy fell squarely within this definition, and although
Abdoulaye was not present when the seizure took place, the IJ
found that he was involved in planning the mutiny. (The
statute defines "engag[ing]" in terrorist activity to include
preparing and planning a terrorist activity.
§ 1182(a)(3)(B)(iv)(II).) The IJ rejected Abdoulaye's character-
ization of the mutiny as a non-violent protest involving
nothing more than a "conversation" with the governor;
Abdoulaye's version was not supported by any evidence
beyond his own testimony, and news reports of the mutiny
from the BBC and the United Nations Office for the Coordina-
tion of Humanitarian Affairs directly contradicted Abdoulaye's
depiction of events. The IJ also rejected Abdoulaye's disavowal
of his role as a planner of the mutiny. The judge commented
that even if he accepted that Abdoulaye's asylum application
overstated his role, Abdoulaye's own testimony demonstrated
that he had been involved with the mutiny at the planning
stages. Other evidence—including Abdoulaye's flight from
Niger on the eve of the mutiny and the government document
identifying Abdoulaye as an organizer—corroborated the fact
that his involvement was non-trivial. All of this added up, in
the IJ's view, to the conclusion that Abdoulaye had provided
material support for terrorism, as described in Section

1182(a)(3)(B)(iv)(VI). This served as an alternative basis for Abdoulaye's inadmissibility.

Although the terrorism finding rendered Abdoulaye ineligible for adjustment of status, asylum, and withholding of removal under both 8 U.S.C. § 1231 and the CAT, he remained eligible for deferral of removal under the CAT. The IJ granted this relief after concluding that Abdoulaye had established that he would "more likely than not" be subjected to torture if forced to return to Niger. The IJ based this conclusion on Abdoulaye's expressed fear of imprisonment and torture, as well as on U.S. State Department reports indicating that the Nigerien government had arrested and tried soldiers involved in the 2002 mutiny, sentencing several to prison terms of three to seven years.

C

Abdoulaye and the government cross-appealed to the BIA, which affirmed the IJ's determination that Abdoulaye engaged in terrorist activity. It declined to reach the additional question whether Abdoulaye provided material support for terrorism. The Board first observed that the mutineers' seizure of the governor brought the Diffa mutiny within the statutory definition of terrorist activity. It then concluded that the IJ's factual findings that Abdoulaye was both involved in planning the mutiny and aware that the plans included a plot to seize the governor were not clearly erroneous. It identified Abdoulaye's testimony that he was involved in planning the mutiny, his written statement, the government document listing him as an organizer, and his decision to obtain both the Belgian and the U.S. visas as record evidence supporting the IJ's findings.

The Board disagreed, however, with the IJ's decision to grant Abdoulaye deferral of removal under the CAT. It vacated that part of the IJ's decision, concluding that Abdoulaye had failed to meet his burden of showing it was more likely than not he would be tortured if returned to Niger, as opposed to merely being arrested and imprisoned as a lawful sanction for his role in the mutiny. The Board acknowledged Abdoulaye's testimony that many mutineers had not been heard from since their arrests, but it noted the absence of any evidence to support this assertion. State Department reports contradicted Abdoulaye's contention; they indicated that the Diffa mutineers were in fact receiving trials and appeals and that their prison terms ranged from three to seven years. And while the Board acknowledged reports showing that prison conditions in Niger are poor and life-threatening, it concluded that poor prison conditions do not amount to torture unless the person can show that he would likely be targeted for poor treatment in prison or that the poor conditions are "specifically intended to inflict severe pain or suffering" on the prisoners. Abdoulaye now petitions for review of the Board's decision, challenging both the finding that he engaged in terrorist activity and the conclusion that he failed to establish his eligibility for CAT protection.

## II

Abdoulaye contends that a number of the Board's determinations are unsupported by the record–in particular, (1) the Diffa event was a mutiny (as opposed to a peaceful protest) during which the governor was seized or detained; (2) he played a non-trivial role in planning the mutiny; and (3) it was not more likely than not that he would be tortured if returned to Niger. We review the Board's findings under the "substantial evidence" standard, which requires us to assess whether

the Board's determination is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole,'" and to "reverse only if the evidence compels a contrary conclusion." *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). Where the Board adopts an IJ's decision and supplements it with its own reasoning—as the Board did here with respect to whether Abdoulaye engaged in terrorist activity—we review the IJ's decision as supplemented. See *Raghunathan v. Holder*, 604 F.3d 371, 379 (7th Cir. 2010). By contrast, where the Board issues its own opinion independent of the IJ's ruling—as it did with respect to whether Abdoulaye was eligible for deferral of removal under CAT—we review the Board's decision only. See *Martinez-Buendia v. Holder*, 616 F.3d 711, 714-15 (7th Cir. 2010).

## A

The central question in this petition is whether the Board's finding that Abdoulaye engaged in terrorist activity is properly supported. The definition of terrorist activity in the INA includes "[t]he seizing or detaining, and threatening to kill, injure, or *continue to detain*, another individual in order to compel a third person . . . to do or abstain from doing any act as an explicit *or implicit condition* for the release of the individual seized or detained." 8 U.S.C. § 1182(a)(3)(B)(iii)(II) (emphasis added). The Board reasonably concluded that this definition encompasses hostage-taking of the sort that occurred when the Diffa mutineers seized the regional governor and made demands on the government. We note, though it is of no moment here, that the statutory definition sweeps in far more than such paradigmatic cases of political hostage-taking because there is no requirement that the seizure or detention be

politically motivated; simple kidnapping, for example, would appear to qualify as terrorism under the statute. See *Hussain v. Mukasey*, 518 F.3d 534, 537-38 (7th Cir. 2008). We can readily dispatch Abdoulaye's argument that the IJ had no basis for concluding that the Diffa mutiny was violent or that the governor was technically "seized." News articles from multiple sources uniformly described the mutiny as an armed uprising that involved the seizure of the governor, and the IJ stated that he was crediting these reports over Abdoulaye's contrary description of events. In the face of conflicting evidence, the IJ was entitled to credit the evidence supporting the government's position. See *id.* at 536. Abdoulaye produced no evidence to indicate that the news reports of the Diffa mutiny were inaccurate, nor can he maintain that sources such as the BBC and the United Nations are so inherently biased or unreliable that crediting their reports would be absurd.

Abdoulaye's remaining objection to the IJ and Board's findings is equally unavailing. Though Abdoulaye emphatically denies having participated in planning the mutiny, considerable evidence in the record indicates otherwise. First, Abdoulaye's conduct in the days leading up to the mutiny was not what one would expect of a low-level participant: he obtained multiple visas in anticipation of the need to flee, and he was gone the moment he realized that the government had gotten wind of the mutiny plot. Second, a government document listed Abdoulaye as an organizer of the mutiny. Third, Abdoulaye acknowledged that he was involved in the planning to at least some degree, and the IJ and Board were free to take the position that, were it otherwise, his decision to flee Niger before the mutiny began would not have made much sense. Finally, there is the written statement accompanying Abdoulaye's asylum application. Although Abdoulaye

attempts to avoid that statement as something that was the product of mistranslation and his poor abilities in French, its description of Abdoulaye's role in the mutiny is consistent with the other evidence tending to show that he played a non-trivial role in the mutiny's planning stages. Abdoulaye's claim that he did not understand the contents of the written statement because of his difficulties with French is especially unpersuasive. Abdoulaye did not so much as hint that he had trouble understanding French—to the contrary, he repeatedly identified French as his native language—until his final appearance before the IJ, at which point the damaging nature of the statement had already become clear. In short, there was ample evidence in the record to support the IJ's determination that, rather than being "a simple soldier involved in the Diffa mutiny," Abdoulaye was "actively involved" in planning it.

## B

Nor are we persuaded that Abdoulaye met his burden of establishing that he would likely be tortured if returned to Niger. (We note in passing that in overturning the IJ's determination that Abdoulaye would more likely than not be subjected to torture if returned to Niger, the Board applied *de novo* review. This was in conflict with the holdings of four of our sister circuits, see *Ridore v. Holder*, 696 F.3d 907 (9th Cir. 2012); *Hui Lin Huang v. Holder*, 677 F.3d 130 (2d Cir. 2012); *Turkson v. Holder*, 667 F.3d 523 (4th Cir. 2012); *Kaplun v. Att'y Gen.*, 602 F.3d 260 (3d Cir. 2010). We need not decide whether this was correct, or if not, how any error may have affected Abdoulaye's petition. Abdoulaye did not object to the Board's standard of review in his petition to this court, and arguments not raised in a petition for review are waived. *Asere v. Gonzales*,

439 F.3d 378, 381 (7th Cir. 2006); accord *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 529 (7th Cir. 2003).) The State Department Country Reports in the record indicate that the people involved in the Diffa mutiny have been arrested, tried, and imprisoned. Neither these reports nor any other evidence, however, indicates that any of the mutineers has been tortured, killed, or even lawfully sentenced to death. Prison sentences for the mutineers have ranged from three to seven years, and some mutineers have succeeded in overturning their convictions on appeal. Thus, although Abdoulaye expresses fear that he will be detained indefinitely without trial or killed should he return to Niger, the Board was entitled to conclude that his testimony, without more, was insufficient to contradict the record evidence suggesting that neither outcome was probable.

Abdoulaye emphasizes that the State Department reports acknowledge that prison conditions in Niger are "poor and life threatening." The reports note that prisons are severely overcrowded, that "nutrition, sanitation, and health conditions [a]re poor," and that deaths from disease occur. While we are willing to assume that prison conditions in Niger are terrible, this alone does not demonstrate that Abdoulaye will be tortured if he finds himself in prison as a result of his role in the Diffa mutiny. Unpleasant though it may be, imprisonment imposed as part of a lawful sanction does not constitute torture in and of itself. 8 C.F.R. § 1208.18(a)(3); see also *Pavlyk v. Gonzales*, 469 F.3d 1082, 1091 (7th Cir. 2006). Abdoulaye could establish eligibility for CAT protection by showing that he was likely to be targeted for mistreatment in prison or that the harsh conditions in Nigerien prisons are specifically intended to inflict pain and suffering on the prisoners, see, *e.g.*, *Kang v. Att'y Gen.*, 611 F.3d 157, 165 n.3 (3d Cir. 2010) (harsh prison conditions are not themselves a basis for relief without show-

ing of some sort of targeted intent to harm the applicant); *Eneh v. Holder*, 601 F.3d 943, 948 (9th Cir. 2010) (same); *In re J-E*, 23 I. & N. Dec. 291, 300-01 (B.I.A. 2002) (same), but he has not presented any evidence that would support either determination. Based on the record before us, we cannot conclude that the Board erred in finding that Abdoulaye failed to carry his burden of proof on his CAT claim.

Finding no error in the Board's decision, we DENY the petition for review.