In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 13-1792

MARIYA BORISOVA GEORGIEVA and
LACHEZAR D. DIMITROV,

*Petitioners*,

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent*.

---

On Petition for Review of a Final Order of
the Board of Immigration Appeals.

---

ARGUED JANUARY 15, 2014 — DECIDED MAY 6, 2014

---

Before FLAUM, EASTERBROOK, and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Mariya Borisova Georgieva and Lachezar Dimitrov are Roma asylum-seekers. In 2002, the couple left Bulgaria and entered the United States legally. They say they were fleeing some of their non-Roma countrymen who had threatened Georgieva after she resisted being forced into the sex trade and became active in pro-Roma

politics. Georgieva and Dimitrov also say they wanted to escape the atmosphere of persecution that faces the Roma people in Bulgaria. The immigration judge found Georgieva's testimony incredible and denied Georgieva and Dimitrov asylum. The Board of Immigration Appeals affirmed the immigration judge's decision. We deny the couple's petition for review.

## I. Background

Georgieva and Dimitrov were born in Bulgaria and are Bulgarian citizens. They were admitted to the United States on March 6, 2002.[1] On March 5, 2003, Georgieva timely requested asylum, withholding of removal, and protection under the Convention Against Torture. On her application, Georgieva listed her husband Dimitrov as a derivative beneficiary. Georgieva filed her application with the Immigration and Naturalization Service, which referred her case to the Department of Justice's immigration courts on April 9, because the immigration courts have exclusive jurisdiction over Visa Waiver Program asylum applicants. 8 C.F.R.

---

[1] Both were admitted under the Visa Waiver Program, which is a reciprocal waiver arrangement where the United States waives its visa requirement and in exchange the visitor waives his or her right to contest admissibility determinations on removal (except for asylum applications, withholding of removal, and protection under the Convention Against Torture). 8 U.S.C. § 1187(b)(2); *Bao Tai Nian v. Holder*, 683 F.3d 1227, 1228 (9th Cir. 2012). Visa Waiver Program entrants are entitled to something of a "shortcut" in the asylum process, because they can proceed directly to a hearing before an immigration judge, bypassing some preliminary steps. *See, e.g.*, *Bayo v. Napolitano*, 593 F.3d 495, 499 (7th Cir. 2010). The program is available for citizens of thirty-eight different countries, but Bulgaria is not among them. It is not clear from the record how Georgieva and Dimitrov were admitted through the program.

§ 1208.2(c)(1)(iii). Proceedings commenced in August 2004, but the case was continued several times. Georgieva and Dimitrov did not appear before an immigration judge until May 2011.

Georgieva's credibility is the central issue in this case, because she provided most of the relevant facts and documentary evidence is sparse. Georgieva included in her asylum application a six-page statement describing her experiences in Bulgaria. She also testified at her immigration hearing, and discrepancies emerged between the statement and her testimony. We note where the stories diverge as we go.

Georgieva grew up in Blagoevgrad, Bulgaria. As a Roma child, she faced challenges. For example, she described one incident in the sixth grade, where a few non-Roma boys followed her into the bathroom at school. They pushed her down, beat her, yelled at her and called her "a dirty gypsy," and urinated on her. She reported the incident to school officials. But instead of responding, the officials accused her of lying and punished her. Georgieva says she received high grades in school and applied to colleges, but that she was not admitted because she was Roma.

In 2000, Georgieva began working either for a cleaning company or as a street sweeper for Blagoevgrad County (there is a discrepancy between her statement and hearing testimony). In November 2000, Georgieva's boss allegedly called her into his office and offered her a higher-paying job working in a meat factory in Naples, Italy; he claimed the position was part of an exchange program. Georgieva accepted, and met her boss's associates at the Blagoevgrad bus station, where there were seven other Roma women who had accepted the same "offer." The bus was to travel

through Macedonia and other former Yugoslav Republics on the way to Naples.

Shortly after the bus crossed into Macedonia, the group stopped for lunch at a hotel. Armed men arrived and ordered the women into hotel rooms. The women were then given clothing and makeup and returned to the hotel lobby where they were displayed to "important" men who would select them for sex. At this point Georgieva's asylum application begins to differ markedly from her hearing testimony.

In her application statement Georgieva wrote that she "was forced to have sex with a strange man who paid for her like she was meat." She claimed that this happened multiple times—enough that she lost track of the days—and that the captors moved the women around to different places. Eventually, Georgieva escaped by hitting a man over the head with a lamp as he was undressing. She ran away, and was aided by Macedonian laborers working in a field. The laborers gave her a change of clothes, and eventually a "nice old man" drove her back to the Bulgarian border. Georgieva said it took her three more days to get home from there.

Her hearing testimony differs in several particulars. Although Georgieva still claimed that she was abducted and that her captors tried to force her into the sex trade, she said that she never had sex with anyone, because she cracked the head of the very first man who selected her on the first day in Macedonia. She said she walked all the way back to Blagoevgrad after her escape, which took her two days in total. Once home, she tried to report her story to the police, the prime minister, and other officials within the Bulgarian government, but to no avail.

Georgieva's stories converge again here. In 2001, she became involved with a group called Euroroma that advocated for Roma rights in Europe. She volunteered there for the next year. Dimitrov and his family were active in the organization, too. Through Georgieva's work there, the couple met and began to date.

At some point after she started working for Euroroma, Georgieva says she received telephone threats from associates of her former boss. She also claims that in January of 2002, two men who worked in the sex-trafficking ring abducted her outside the Euroroma office. One of the men told her that "gypsies like you don't live long." The men took Georgieva to an abandoned building and beat her so severely that she passed out.

The accounts diverge again after the beating. In her application, Georgieva claimed that she woke up a few days later in the hospital; some kids had found her in the building and the police had taken her to the hospital. At her hearing, however, she testified that the beating put her into a coma for twenty or twenty-one days and broke her jaw. Georgieva's jaw required surgery, but the hospital refused service because Georgieva was Roma and she had no health insurance. Instead, Dimitrov found a private dentist who did a minimal amount of repair work for a small cost.

Shortly after the beating incident, the couple left for the United States. Dimitrov testified that Georgieva suffered from pain and constant headaches as a result of the beating and that she has received additional medical care in Evanston, Illinois. Both testified that they fear persecution if they are returned to Bulgaria, especially because both of their families have left the country and now reside in Italy and the

United Kingdom. Georgieva and Dimitrov have two American-born sons, aged six and ten, and the older son has been diagnosed with autism.

At the outset of the hearing, the immigration judge found Georgieva's different accounts of her time in Macedonia "very clear, detailed, and specific," and impossible to reconcile. The immigration judge thought the discrepancies serious, and decided that Georgieva had not adequately explained them. Moreover, the immigration judge had brought the discrepancies to Georgieva's attention at the outset of the hearing. Georgieva claimed that her asylum application was inaccurate, but she made only small tweaks that did not address the central inconsistencies and she did not explain why she had not amended her application further. The immigration judge acknowledged that inaccuracies in initial asylum applications are common, often because of faulty translations or the lack of counsel. But an attorney assisted Georgieva in preparing her application and Georgieva did not claim that the translation was faulty. The immigration judge went on to find that Georgieva had not provided enough documentary evidence to corroborate her story, and so ordered Georgieva and Dimitrov removed to Bulgaria.

The couple appealed to the Board of Immigration Appeals, and while the appeal was pending also filed a motion to remand to the immigration judge. In their remand motion, the couple argued that they had received ineffective assistance both from their counsel before the immigration judge and from the lawyer who had helped prepare Georgieva's initial application.

Before the Board, Georgieva and Dimitrov's new attorneys argued that any discrepancies in Georgieva's stories

were due to clerical or translation errors, and that Georgieva had not had an opportunity to explain them. But the Board found that the immigration judge's credibility finding was based on specific evidence and was adequately explained. The Board also found that Georgieva had been given the opportunity to reconcile her stories, but had not done so. Finally, the Board denied the request for a remand based on inadequate assistance, because it thought Georgieva and Dimitrov's counsel in the immigration proceedings competent.

## II. Discussion

In cases like this, where the Board of Immigration Appeals' order supplements the decision of the immigration judge, we review the immigration judge's opinion as supplemented by the Board. *Raghunathan v. Holder*, 604 F.3d 371, 379 (7th Cir. 2010). We review factual findings only to ensure that substantial evidence supports the immigration judge's or Board's decision. *See, e.g.*, *Abdoulaye v. Holder*, 721 F.3d 485, 490 (7th Cir. 2013).

Under the Immigration and Nationality Act, the Attorney General or the Secretary of Homeland Security may grant asylum to refugees. 8 U.S.C. § 1158(b). A refugee is "any person who is outside any country of such person's nationality … who is unable or unwilling to return to … that country because of persecution or a well-founded fear of persecution on account of race, nationality, membership in a particular social group, or political opinion … ." 8 U.S.C. § 1101(a)(42)(A). This means asylum applicants must show either past persecution or a well-founded fear of future persecution because of membership in a protected class. *See Wang v. Gonzales*, 445 F.3d 993, 997–98 (7th Cir. 2006). An applicant's proof of past persecution can come from multiple

sources, including a recitation of her experiences in her asylum application, testimony at her immigration hearing, and any supporting documentary evidence, if it exists. *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004).

## A. The immigration judge's credibility finding

In asylum cases, traditional or objective means of authenticating an applicant's statements can be difficult or impossible–applicants often hail from war-torn, impoverished, or inhospitable parts of the world. Thus, the immigration judge must often evaluate the credibility of the applicant claiming persecution, which the immigration judge can do by considering the "internal consistency, detail, and plausibility" of the applicant's story. *Capric*, 355 F.3d at 1085 (citations omitted). If the applicant's testimony is credible, it can be sufficient to satisfy her burden. But if the immigration judge finds the applicant incredible due to inconsistencies, then the applicant must explain the discrepancies and provide credible, extrinsic evidence in corroboration. *Id.* at 1086.

Georgieva applied for asylum before the enactment of the Real ID Act, which limits judicial review of an immigration judge's credibility finding. 8 U.S.C. § 1158(b)(1)(B)(iii). The new standards apply only to asylum applications submitted after the enactment of the statute—May 11, 2005. Pub. L. No. 109-13, § 101, 119 Stat. 231, 305 (2005); *Mitondo v. Mukasey*, 523 F.3d 784, 787 (7th Cir. 2008). Thus, we review Georgieva's application under pre–Real ID Act law. We will uphold the immigration judge's credibility finding so long as it is supported by "specific, cogent reasons [bearing] a legitimate nexus to the finding." *Capric*, 355 F.3d at 1086 (citations and internal quotation marks omitted). Only those inconsistencies that "go to the heart of" the applicant's asylum

claim can support an incredibility finding; minor inconsistencies on peripheral matters cannot. *Id.* at 1090.[2]

The immigration judge's incredibility finding in this case centered on Georgieva's two retellings of her encounter with the Macedonian sex trade. Simply put, Georgieva could not have been forced to have sex with multiple individuals over multiple nights but also have escaped on her first night in Macedonia without having sex with anybody. She also could not have been sheltered by Macedonian laborers and shuttled to the Bulgarian border by a kindly old man while also walking all the way from Macedonia back to Blagoevgrad. These discrepancies fairly "go to the heart of" Georgieva's claim. The incident in Macedonia was central to her claim of past persecution.

We have warned of the problems that can sometimes arise with statements that accompany initial asylum applications—i.e., poor translators, careless or unscrupulous preparers, or the lack of legal counsel. *See, e.g.*, *Chen v. Gonzales*, 420 F.3d 707, 710 (7th Cir. 2005). But the immigration judge realized and discussed these problems and Georgieva did not argue that there were translation problems. She also had an attorney representing her when she filed her application.[3]

---

[2] Under the Real ID Act, by contrast, immigration judges can base an adverse credibility finding on any inconsistency, whether it goes to the heart of the applicant's claim or not. 8 U.S.C. § 1158(b)(1)(B)(iii).

[3] The immigration judge also noted the other, more minor inconsistencies in Georgieva's stories. The immigration judge took care to note that these inconsistencies (relating to Georgieva's former place of employment and the way Georgieva arrived at the hospital after being assaulted) would not have supported an incredibility finding on their own, but further supported the incredibility finding.

The immigration judge also afforded Georgieva the chance to cure the inconsistencies by amending her statement. When she was asked specifically about the discrepancies, Georgieva said that she had "clarified with her attorney that her original statement was in error." But she did not attempt to explain how the error on the application occurred in the first place or offer any further explanation. Her attorney amended the application to correct a few clerical errors, but left the heart of the story intact.

The immigration judge also properly gave Georgieva the chance to corroborate her testimony and rehabilitate herself with documentary evidence. *See Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003). Georgieva attempted to corroborate her story by introducing a copy of her passport pages showing that she left Bulgaria for Macedonia and returned one day later, her Euroroma membership card, and medical records from when she was assaulted outside Euroroma. But the immigration judge was unconvinced, because these documents did not cure the fundamental inconsistencies in her testimony. The immigration judge also explained that Georgieva could have reasonably provided additional corroboration—perhaps via affidavits from family or friends— of the beating she suffered as a child or the attempt to sell her into the sex trade. If such evidence was unavailable, it was Georgieva's burden to explain why she had not produced it and why it was unreasonable for the immigration judge to expect her to do so. *See Hussain v. Gonzales*, 424 F.3d 622, 629 (7th Cir. 2005) (noting that an immigration judge must explain "why it is reasonable to expect additional corroboration … [and] an account of why the petitioner's explanation for not producing that corroboration is inadequate."). She did not explain either. Accordingly, it was rea-

sonable for the immigration judge to conclude that Georgieva had not overcome the discrepancies in her stories that led to the incredibility finding.

One feature that gives us pause is that Georgieva's hearing testimony, which she claims is the accurate telling, is actually the less severe of the two stories. An asylum applicant would be more likely to embellish, not scale back, her story at the hearing, in an effort to bolster her case. *See, e.g.*, *Xiao v. Mukasey*, 547 F.3d 712, 717 (7th Cir. 2008) (upholding adverse credibility finding where an asylum-seeker initially failed to disclose alleged forced abortion at the hands of Chinese officials but then sought to include it in her application and at her hearing). But this feature of Georgieva's case cannot rescue her from the immigration judge's adverse credibility finding. Our decision in *Ahmad v. INS*, 163 F.3d 457 (7th Cir. 1999), is instructive. The asylum applicant there was an Ahmadi Muslim seeking to avoid removal to Pakistan. In his asylum application, he claimed that Sunni Muslims in Pakistan had regularly tortured him and had threatened him if he did not leave the country. But at his hearing, the applicant walked back his accusations—he claimed that while his tormenters tied him to a pole overnight, they had harassed him only once and never tortured him. *Id.* at 459–62. So while we also face testimony less horrific than the allegations contained in the initial application, we must affirm the immigration judge's finding, as we did in *Ahmad*.

Georgieva had a new lawyer before the Board of Immigration Appeals and sought a remand to the immigration court in part for ineffective assistance of counsel. She claimed that the deficient performances of both the attorney who helped prepare her initial application statement and the

attorneys who represented her in the immigration court led to the adverse credibility finding. But the Board found the performance of Georgieva's former attorneys adequate, especially since her second crop of attorneys had the opportunity to—and did—amend her earlier statement.

On appeal, Georgieva does not argue ineffective assistance of counsel directly, but she raises the same alleged shortcomings by her attorneys to explain the inconsistencies in her testimony. In short, she says that her asylum application statement was inaccurately taken by her first lawyer, and that the lawyers who represented her in the immigration court failed to amend the meat of her claim (though they did change a few dates), despite telling her that they would. The immigration judge asked Georgieva directly about the inconsistencies in her story and she indicated that her lawyer had fixed the errors in her application. But she now says that this was a misunderstanding on her part. What happened, she avers, is that the immigration judge and the attorneys had an untranslated colloquy where the small changes were actually made, and that she mistakenly thought the lawyer had made the substantive changes she requested. Thus, when the judge asked her about the inconsistencies between her application and hearing testimony, she did not know what she was conceding.

Georgieva's motion before the Board was brought pursuant to *Matter of Lozada*, 19 I. & N. Dec. 637 (B.I.A. 1988), which set forth procedures for pursuing an ineffective assistance of counsel claim before the Board. *Lozada* requires that the lawyer whose performance is being attacked be notified and be given the opportunity to respond. *Id.* at 639. Georgieva's attorneys from the immigration court moved on

their own to supplement the record before the Board and de-
fend their performance—they said that Georgieva was con-
fused about what had happened and had difficulty keeping
her stories straight during hearing preparation, and that the
immigration judge gave her plenty of opportunities to
amend her application. Georgieva of course disputes this
claim. But whatever actually transpired during Georgieva's
hearing preparation, she has nothing but her bare assertion
to suggest that she was unaware of the contents of her
statement or that the immigration judge did not give her a
genuine opportunity to make corrections. In the immigration
context, as in other areas, "[l]itigants are generally bound by
the conduct of their attorneys, absent egregious circum-
stances." *Id.* The immigration judge was in the best position
to evaluate Georgieva's credibility, and nothing about her
lawyer's performance requires us to upset the immigration
judge's finding of incredibility.

## B. Past persecution

Though we affirm the immigration judge's credibility de-
termination, Georgieva would still be entitled to relief if she
could demonstrate through independent evidence that she
was a victim of past persecution. But persecution is more
than harassment, and Georgieva cannot make the strong
showing required. *See Ciorba v. Ashcroft*, 323 F.3d 539, 545
(7th Cir. 2003). Persecution includes:

> detention, arrest, interrogation, prosecution, impris-
> onment, illegal searches, confiscation of property,
> surveillance, beatings, torture, … behavior that
> threatens the same … and non-life-threatening behav-
> ior such as torture and economic deprivation if the re-
> sulting conditions are sufficiently severe. … However,

> generalized conditions of hardship which affect entire populations do not rise to the level of persecution.

*Capric*, 355 F.3d at 1084 (internal citations and quotation marks omitted).

Outside of her testimony, Georgieva lacks evidence to show that she was persecuted because she is Roma. She has no evidence corroborating the childhood incident that occurred in the school restroom. She also has nothing to support her claim that she was targeted for the sex trade, nor anything to connect her 2002 assault to her status as a Roma. Although Georgieva did not contradict herself in the retelling of some incidents, such as the beating she suffered as a child, a "single discrepancy is enough to find petitioner's entire testimony not credible." *Xiao*, 547 F.3d at 717.

The corroborating evidence—consisting of Dimitrov's testimony, a copy of a page from her passport, her Euroroma membership card, and some dental records—merely shows that Georgieva is Roma, that she was in Euroroma, that she was in Macedonia for one day in 2000, and that she had dental surgery after being assaulted in 2002. None of this evidence shows that any of the harm she suffered was because of her Roma heritage.

## C. Well-founded fear of future persecution

Asylum applicants who have not been persecuted in the past can still demonstrate eligibility for asylum by showing a fear of future persecution that is subjectively genuine and objectively reasonable. *See, e.g.*, *Li Ying Zheng v. Holder*, 722 F.3d 986, 990 (7th Cir. 2013). The applicant's subjective fear is generally established through her testimony and depends on the immigration judge's evaluation of her credibility. *Capric*,

355 F.3d at 1085. The objective component requires the applicant to prove either (1) a reasonable probability she will be singled out for persecution or (2) a pattern or practice of persecution against a particular group, to which she belongs. 8 C.F.R. § 208.13(b)(2).

Georgieva introduced no evidence (except her testimony) that she would be singled out for persecution upon returning to Bulgaria. So she can prevail only if she can demonstrate a pattern or practice of mistreatment of the Roma people in Bulgaria. Pattern and practice requires a strong showing, and persecution of an ethnic group must be "extreme" to qualify. *Mitreva v. Gonzales*, 417 F.3d 761, 765 (7th Cir. 2005). As we have often indicated, "[t]here must be a systematic, pervasive, or organized effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetrated or tolerated by state actors." *Id.* (citations and internal quotation marks omitted).

In *Mitreva*, we were also faced with a Roma asylum-seeker from Bulgaria. The conditions on the ground for the Bulgarian Roma then were similar to what they are now. There is no doubt that the Roma are victims of pervasive discrimination in employment, education, health care, and housing, and are occasionally the targets of violence. *See* U.S. Dep't of State, Country Reports on Human Rights Practices for 2013, Bulgaria, at 24–26 (2013), *available at* http://www.state.gov/documents/organization/220473.pdf. But there is no indication that the Bulgarian government sanctions this conduct. *Id.*; *Mitreva*, 417 F.3d at 766. If anything, State Department reports indicate that anti-Roma violence has declined since *Mitreva* was decided in 2005, even as discrimination remains widespread. *See* U.S. Dep't of State,

2010 Country Reports on Human Rights Practices, Bulgaria, at       23       (2010),       *available*       *at* http://www.state.gov/documents/organization/160182.pdf. In short, there is no reason for us to find a pattern of persecution of the Roma in Bulgaria in 2014 where there was none in 2005.

Georgieva also makes a claim for humanitarian asylum based on the "other serious harm" her family will suffer if removed, because of the ages of her children and her older son's autism. However, humanitarian asylum is only available for those asylum-seekers who have demonstrated past persecution. *See, e.g.*, *Matter of L-S*, 25 I. & N. Dec. 705, 710 (B.I.A. 2008). Because Georgieva has not established past persecution, she is ineligible for humanitarian asylum.

Finally, to be eligible for withholding of removal, Georgieva must show a "clear probability" that she would be persecuted. *Toure v. Holder*, 624 F.3d 422, 428 (7th Cir. 2010). Similarly, relief under the Convention Against Torture only applies where it is "more likely than not" that the deportee will be tortured if returned to the country of removal. *Id.* at 429. Thus, Georgieva's other claims require a stronger case than that needed for asylum, so they fail as well.

The petition for review is DENIED.