NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 16, 2015
Decided March 29, 2016

**Before**

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 15-2099

| | |
|---|---|
| ANDREI DAVIDESCU, | Petition for Review of an Order of the |
| *Petitioner*, | Board of Immigration Appeals. |
| | |
| *v.* | No. A205-556-102 |
| | |
| LORETTA E. LYNCH, | |
| Attorney General of the United States, | |
| *Respondent*. | |

## O R D E R

Andrei Davidescu, a 27-year-old Moldovan citizen, sought asylum, withholding of removal, and protection under the Convention Against Torture, based on harm he suffered on account of his Roma ethnicity. In his testimony he described numerous attacks at the hands of classmates and neighbors while he was growing up in Moldova. The immigration judge, however, noted significant inconsistencies in his hearing testimony, found him not credible, and concluded that he had not sufficiently corroborated his claim. Because these conclusions are supported by substantial evidence, we deny the petition for review.

Davidescu was admitted into the United States in June 2010 with permission to participate in an exchange-worker program. He was authorized to stay for a temporary period not to exceed September 11, 2010, but he overstayed. In September 2012 he applied for asylum affirmatively with U.S. Citizenship and Immigration Services, which generally has initial jurisdiction over asylum applications filed by aliens who are physically present in the United States and not already in removal proceedings. *See* 8 C.F.R. § 208.2(a). Because more than one year had elapsed since his entry, however, the asylum officer determined the application to be untimely. *See* 8 U.S.C. § 1158(a)(2)(B). Davidescu received a notice to appear before an immigration judge, charging him as removable for having remained in the country longer than permitted. *See* 8 U.S.C. § 1227(a)(1)(B). In removal proceedings, Davidescu renewed his application for asylum, withholding of removal, and protection under CAT.

Davidescu testified that he grew up in Chioselia Rusa, a town of approximately 2,000 people. His father is Roma, but his mother is Moldovan. Despite his mother's heritage, he was considered Roma because of the color of his skin and because his father was known by other villagers to be Roma (and Davidescu self-identified with this group as well).

In his testimony Davidescu described several instances of being bullied at school for being Roma. First, in 2001, when he was in seventh grade, a schoolmate pushed and hit him a couple times while using anti-Roma slurs. Then in 2003 schoolmates again pushed and hit him—causing a cut to his chest, bruises, and a broken finger. They told him that he was not welcome in the village or school because he was Roma. And in 2006, after a banquet for his high school graduation, two young men beat him because he defied their warnings that he was not welcome at the gathering. Davidescu received bruises on his ribs, legs, and torso. He testified that he did not report this beating to the police. He also wrote in his affidavit (but omitted from his hearing testimony) that he was beaten generally by fellow university dorm-mates, who said they were tired of "misborn" Roma.

Davidescu recounted two incidents that occurred in 2009. In April he was assaulted by two people on his way home from his university in Chisinau, Moldova's capital. The attackers knocked him down and told him that, as a Roma, he had no right to be there. His injuries, which included a concussion and bruises, required him to be hospitalized for ten days. Then in August 2009, he again was beaten in a Chisinau park by a group of people who insulted him for being Roma.

In June 2012, while Davidescu was still in the United States, his father in Moldova was kicked and knocked unconscious in an attack by a group of drunk neighbors. His father was taken to the hospital and diagnosed with a concussion. Davidescu says this attack led him to apply for asylum.

Without addressing the timeliness of the asylum application, the IJ denied Davidescu's applications for all relief from removal because she found him not credible and his claim insufficiently corroborated. She concluded that there were major inconsistencies in Davidescu's account concerning central aspects of his claim. For instance, regarding the 2006 beating, Davidescu stated in his affidavit that he suffered a nose fracture and a torn lip and that afterwards he had called the police, but in his testimony he denied these details. When asked to clarify, Davidescu was unable to explain the different accounts, and he compounded the confusion about the police's involvement, saying first that someone else had called the police and later that he stopped at a police station on the way home. In addition, Davidescu testified inconsistently about his interactions with the police after the April 2009 attack. On direct examination he said that he reported the incident to police and was never again contacted. But on cross-examination he stated that the police detained him at the scene of the beating, blamed him for the attack, and, after taking him to the police station, struck him on the head with a rubber baton. Davidescu also testified he then went to a hospital on his own power, but the hospital records reflect that only after being hospitalized did he regain consciousness. Finally, his testimony about being beaten in a park in August 2009 was contradicted by a police notice and a letter from his lawyer in Moldova stating that he merely had been insulted. The IJ concluded that Davidescu's corroborating evidence was insufficient to clarify his inconsistent testimony or meet his burden of proof.

Davidescu appealed to the Board of Immigration Appeals, challenging the IJ's adverse-credibility finding. He argued, without elaboration, that he had established a pattern or practice of persecution of Roma in Moldova. The Board upheld the IJ's decision. It agreed that Davidescu failed to explain major inconsistencies in his account and he did not sufficiently corroborate events forming the basis of his claim. The Board also concluded that Davidescu did not substantiate his pattern-or-practice argument or otherwise demonstrate that he has a well-founded fear of persecution.

Now represented by new counsel, Davidescu challenges the IJ's finding that his testimony regarding past incidents of harm was not credible. He claimed that the inconsistencies in his testimony, written submissions, and corroborating evidence were

minor and did not go to the heart of his claim. Inconsistencies need not go to the heart of an applicant's claim to support an adverse-credibility finding, *see* 8 U.S.C. § 1158(b)(1)(B)(iii), but they must be more than trivial, *see Hassan v. Holder*, 571 F.3d 631, 637 (7th Cir. 2009).

The IJ's adverse-credibility finding was proper, however, because the inconsistencies she identified were not trivial and concerned an important aspect of his claim: the severity of the mistreatment he suffered and his interactions with the police. The particulars of the beatings Davidescu experienced and the injuries he sustained were at the heart of his contention that he suffered persecution rather than mere harassment or discrimination. *See Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011). And the inconsistencies regarding his interactions with the police—notably including an allegation that the police hit him in the head with a baton at the police station—were material to assessing the government's willingness and ability to prevent attacks by private actors. *See Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005) ("Persecution is something a *government* does, either directly or by abetting (and thus becoming responsible for) private discrimination.")

Davidescu also makes a two-pronged challenge to the Board's determination that he did not adequately corroborate his claim. He first asserts that the IJ did not give him enough time to gather the necessary evidence to support his claim. But, as the government explains, Davidescu waived this argument by failing to present it first to the Board. *See* 8 U.S.C. § 1252(d)(1); *Ghaffar v. Mukasey*, 551 F.3d 651, 655 (7th Cir. 2008).

Second, Davidescu disputes the IJ's conclusion that his supporting documents were insufficient to corroborate his testimony or otherwise carry his burden of proof. Davidescu also failed to raise this argument before the Board, but waiver is not at issue here because the Board independently addressed the sufficiency of his corroborating documents. *See Arobelidze v. Holder*, 653 F.3d 513, 516–17 (7th Cir. 2011). As the Board noted, however, this case is governed by the REAL ID Act, which justified the IJ in requiring additional documents to clarify the inconsistencies in his testimony. *See* 8 U.S.C. § 1158(b)(1)(B)(ii). The Board properly noted that Davidescu's submissions hardly corroborated the incidents of harm described in his testimony. The medical report from his April 2009 hospitalization contradicts his testimony that he never lost consciousness. And a letter from his lawyer and a police notice both state that he was pushed and insulted in the August 2009 incident, not beaten as he testified. The other significant inconsistencies are not addressed at all by the documents he submitted.

But even if the IJ had accepted Davidescu's testimony as credible and sufficiently corroborated, he has not presented evidence from which to infer the requisite involvement of state actors to establish past persecution. The attacks that Davidescu and his father suffered were at the hands of classmates and neighbors, not state actors, and he has not shown that the government would be unable or unwilling to protect him from harm if he were to return to Moldova. *See Vahora v. Holder*, 707 F.3d 904, 908 (7th Cir. 2013).

Finally Davidescu challenges the Board's determination that he did not establish a pattern or practice of persecution against Roma in Moldova, *see* 8 C.F.R. § 1208.13(b)(2)(iii)(A), or otherwise demonstrate a well-founded fear of future persecution. He did not present any evidence that he would be singled out for persecution, but he argues that Roma face a pattern or practice of persecution in Moldova, as evidenced by the denial of education, adequate medical care, employment opportunities, and other public services. A pattern or practice of persecution, however, requires "a systematic, pervasive, or organized effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetrated or tolerated by state actors," *Ahmed v. Gonzales*, 467 F.3d 669, 675 (7th Cir. 2006) (internal quotation marks omitted), and the Board properly concluded that Davidescu's evidence did not show this. The Roma are victims of deprivations, discrimination, and social marginalization, but these conditions—while deplorable—are not "extreme" enough to qualify as a pattern or practice of persecution sanctioned by the Moldovan government. *See Georgieva v. Holder*, 751 F.3d 514, 523 (7th Cir. 2014). And Davidescu's own experience successfully completing secondary school and some college undermines his assertion that upon return he would be subjected to deprivation extreme enough to rise to the level of persecution.

Because the IJ's findings of adverse credibility and insufficient corroboration were not clearly erroneous and the Board properly concluded that Davidescu did not establish the existence of a pattern or practice of persecution of Roma in Moldova, we deny the petition for review.