Valentin BOYKOV and Krassimira
Boykóva, Petitioners,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 96–1879.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1997.

Decided March 26, 1997.

Royal F. Berg (argued), Chicago, IL, for Petitioners.

Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL, David M. McConnell, Stephen W. Funk, Michael Lindemann, Susie Cho (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before BAUER, FLAUM, and EVANS, Circuit Judges.

FLAUM, Circuit Judge.

Valentin Boykov and Krassimira Boykova seek to avoid deportation to their native country. Preferring to remain in the United States rather than to return to Bulgaria, a nation lately visited by economic instability and political uncertainty, the Boykovs ask us to vacate an order of the Board of Immigration Appeals upholding an immigration judge's denial of their requests for asylum or withholding of deportation. We affirm.

## I.

Valentin Boykov entered the United States on June 11, 1990 as a visitor for pleasure, authorized to remain until December 11 of the same year. Not one but three Decembers passed, however, only to find Boykov joined by his wife, Krassimira Boykova, who, in January 1993, entered the country "without inspection" (in the parlance of the INS), and their two children, who arrived the following September. In October 1993, the INS served the Boykovs with an order to show cause why they should not be deported, and the couple subsequently conceded deportability and filed requests for asylum or withholding of deportation.

Both Valentin and Krassimira, who married in 1980, testified before the immigration judge. Boykov, now 39 years old, was born in Sofia, while Boykova (ne Opalchevska), 36 years of age and an ethnic Macedonian, grew up in Blagoevgrad, in the Macedonian region of Bulgaria. Her father was an outspoken Macedonian nationalist whose opposition to the communist regime following World War II earned him the hostility of Bulgarian authorities, as well as repeated arrests and interrogations and, on at least one occasion, a severe beating. Although the Opalchevskis were permitted to move to Sofia in the 1970s when Krassimira's father found work there, they were forcibly repatriated to Blagoevgrad in 1979 following his death. Krassimira's marriage to Valentin, however, enabled her to return to Sofia.

Much of Boykov's testimony, and of the statement he attached to his asylum application, centered around an incident that took place at a Sofia restaurant in 1980 shortly after his wedding. Boykov, his brother, and a friend had finished dining at the restaurant when an argument over the bill erupted between the three customers and the waitress who had served them. Police were summoned and they sided with the waitress. In a burst of imprudence, Boykov's friend denounced the police as "communist stooges" and declared that only in a communist country could the unfolding scene be staged. As if to prove him correct, the police hauled him away in their car. Boykov never again saw his friend alive. A week later, the friend's parents discovered their son's body in front of their home. Boykov and his brother soon received visits from the police, who warned that they would be killed if they spoke to anyone about the incident. Boykov testified that, until he left Bulgaria, police continued to visit him two to three times a year to remind him to keep quiet.

The connection Boykov drew between the restaurant incident and other events underscores both the episode's psychological impact and the extent to which, for Boykov, it colored his subsequent encounters with the authorities. As Boykov explained in his asylum application, "we were afraid that because of my wife's Macedonian nationality, and the anti-government activities of her family, the police would use that as a pretext to act upon their threats." In fact, following a visit from Boykova's relatives shortly after the friend's death, police broke into the Boykovs' home, arrested and detained them overnight, and questioned them about the purpose of the relatives' visit. Boykova was pregnant at the time.

Boykov's next run-in with the authorities (apart from the periodic police visits) occurred in 1989. Boykov became involved with a branch of the opposition Union of Democratic Forces ("UDF") that had been organized at the construction company where he worked. At a meeting of company employees, he read aloud a UDF report critical of company management, who were all Communist Party members. Boykov testified that, following the meeting, the company's manager and the Communist Party secretary assigned to the company informed Boykov that if he persisted, he could lose his job and his apartment, "and something even worse could happen." When the police next visited Boykov in January 1990, they warned him that "now ... it would be much easier for them to get rid of" him. Asked to interpret this last warning, Boykov responded, "undoubtedly the incident that happened with my friend played a big part, ... but also ... my activities in my work place were ... also a factor." Around this time, Boykov also received threatening telephone calls from anonymous sources who knew "intimate biographical details" about him and his family.

Boykov believes that, since his arrival in the United States, his letters home have been opened and his phone calls intercepted. "I am afraid," he testified, "that if I go back I could be killed, my kids could be kidnapped and I'm 100 percent positive that I wouldn't be able to find any employment." Asked why the Bulgarian government allowed him so easily to leave the country, Boykov explained that he was not a threat from afar: "I'm not such a tremendous political activist and I haven't done anything that in any way threatens the security of the state, the government."

Boykova's testimony mainly recounted the difficulties she encountered after her husband left for the United States. Boykova received threatening phone calls and on one occasion was visited by officials whose questions regarding her husband's whereabouts led her to believe that they were not, as they claimed, conducting a census, but, rather, were connected to the police. She lost her job and, because she "had temporary residency in Sofia only by force of [her] marriage to a ... resident," Boykova was denied government benefits. According to Boykova's asylum application, her repeated requests for government assistance were met either with silence or responses such as, "[G]o to Macedonia for assistance," or, "Since your husband is in America you don't need any money from us." Boykova and her children eventually left Sofia, and they experienced no additional problems before leaving Bulgaria to join Boykov.

The immigration judge denied the Boykovs' asylum applications, and the Board dismissed their appeal. The Board found, first, that the Boykovs' past experiences in Bulgaria did not amount to persecution. Next, the Board ruled that the Boykovs had failed to establish a well-founded fear of future persecution. "[T]he past incidents involving the respondents," the Board opined, "do not provide any basis for a reasonable person in their circumstances to fear persecution, not only in view of the nature of the incidents, but also in light of current conditions existing in Bulgaria." For "current conditions" in Bulgaria, the Board looked to a 1994 State Department report appended to the Department's advisory opinion on the Boykovs' asylum claims. The report, entitled "Bulgaria—Country Conditions and Comments on Asylum Applications," indicates that "country conditions have so altered as to remove the presumption that past mistreatment in the Communist years will lead to mistreatment in the future." Finally, the Board determined that, as the Boykovs had failed to establish their eligibility for asylum, they could not meet the more stringent requirements for withholding of deportation.

## II.

██ The Attorney General has discretion under section 208(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(a), to grant asylum to any alien who qualifies as a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A). Section 1101(a)(42)(A), in turn, defines refugee as any person outside her native country "who is unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." This "well-founded" fear must be both genuine and reasonable, *Najafi v. INS*, 104 F.3d 943, 946 (7th Cir.1997), although an objectively "well-founded" fear may be grounded in something less than a fifty percent probability of future persecution. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 1212–13, 94 L.Ed.2d 434 (1987). In addition, an asylum applicant's experience of past persecution gives rise to a rebuttable presumption in favor of granting asylum. *Angoucheva v. INS*, 106 F.3d 781, 787–88 (7th Cir.1997). In this case, the Boykovs base their requests for asylum on both their experience of past persecution and their fear of future persecution. Our review is limited to asking whether there is substantial evidence to support the Board's conclusion that the Boykovs failed to establish their refugee status.

██ The Board's finding that the Boykovs did not suffer past persecution certainly passes muster under this deferential standard of review. As the Board correctly noted, the threats Boykov received in the wake of his UDF activity were not acted upon. We have left open the possibility that threats of a most immediate and menacing nature might, in some circumstances, constitute past persecution. *See Mitev v. INS*, 67 F.3d 1325, 1330–31 (7th Cir.1995). In the vast majority of cases, however, mere threats will not, in and of themselves, compel a finding of past persecution. Rather, unfulfilled threats will fall within that category of past experience more properly viewed as indicative of the danger of future persecution. The threats connected to Boykov's workplace activity, in

our view, fall within this latter category. Moreover, the ominous warnings that followed Boykov's witnessing his friend's abduction appear to have been motivated by the police's desire to cover up their own misconduct, not by any political belief held by Boykov. Although Boykov argues that the police imputed to him his friend's anti-communist sentiments, we are not disposed to entertain this theory when substantial evidence supports the contrary (and more plausible) explanation credited by the Board.

■ In the period prior to Boykov's departure, only his family's arrest, which followed the visit of Boykova's relatives, provides an example of official conduct amounting to more than threats. In light of the gloss our caselaw has placed on the term "persecution," there was substantial evidence to support the Board's conclusion that the Boykovs' overnight detention, during which no family member was harmed, was not persecution within the meaning of the INA. *Cf. Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir.1990) ("Zalega was never formally charged or convicted of any crime, was detained for relatively short periods of time and was not mistreated while incarcerated."). *See* generally *Mitev*, 67 F.3d at 1331 (collecting cases). Also supported by substantial evidence was the Board's finding that the economic deprivation, in the form of lost employment and denial of child welfare, experienced by Boykova following her husband's emigration was not persecution. While anti-Macedonian sentiment may have animated official responses to her requests for government aid, Boykova's own testimony indicated that her difficulties arose because her continued residence in Sofia was conditioned on the presence of her husband, a native of the city. *Cf. Borca v. INS*, 77 F.3d 210, 216 (7th Cir.1996) ("[T]he economic harm required under *Kovac* [*v. INS*, 407 F.2d 102, 107 (9th Cir.1969)] must be 'deliberate[ly] impose[ed]' as a form of punishment."). In short, having failed to establish past persecution, the Boykovs were not entitled to the presumption that they were eligible for asylum.

■ Likewise, the evidence before the Board did not compel the conclusion that the Boykovs have a well-founded fear of future persecution. Boykova presented no evidence to suggest that she would suffer treatment any less humane than what she already experienced in Bulgaria. Inasmuch as this past treatment did not amount to persecution, there was no reasonable basis, as the Board observed, to believe that she would be persecuted upon her return to Bulgaria. With respect to Boykov, the Board noted that his friend was killed more than 15 years ago (approximately 10 years before Boykov's leaving Bulgaria) and that the police had shown no inclination to harm Boykov so long as he kept quiet. As for anonymous phone calls threatening Boykov's life, the Board found that Boykov's testimony on this subject did not constitute a "believable, consistent, and sufficiently detailed" explanation of the basis for his fears. In the opinion of the Board, Boykov's "account of vague threats, without more is not a basis for fearing persecution in the future." We are no more qualified than the Board to assess the credibility and coherence of Boykov's testimony, and are therefore not inclined to upset this determination.

■ In evaluating the reasonableness of the Boykovs' fear of persecution, the Board looked not only to evidence of past mistreatment but also to current conditions within Bulgaria. The Board relied heavily upon the State Department's 1994 report, which indicates that "Bulgaria has made substantial progress toward Democracy" and suggests that circumstances have so changed as to eliminate whatever value past mistreatment may have had as a predictor of future mistreatment. Based in part on these observations, the Board concluded that neither Boykov's political activity nor Boykova's ethnicity gave rise to a reasonable fear of persecution. We recognize that Bulgaria is in a state of flux, and that any report on a country in which events are rapidly unfolding is vulnerable to charges of incompleteness or obsolescence. We also acknowledge the Boykovs' contention that Bulgaria's political transformation has been largely cosmetic. On this

record, however, neither Boykova's Macedonian heritage nor Boykov's limited participation in a party that has established itself as a major political force within his home country compels the finding that the couple possesses a well-founded fear of being persecuted should they return to Bulgaria.

## III.

The Boykovs also seek withholding of deportation pursuant to section 243(h) of the INA, 8 U.S.C. § 1253(h). In contrast to asylum, withholding of deportation is a mandatory form of relief, for the Attorney General has no discretion to deny withholding of deportation once an applicant establishes statutory eligibility. *Angoucheva*, 106 F.3d at 788–89. This promise of certain refuge, however, carries with it a heavier burden: the applicant must establish a "clear probability of persecution" upon her return, or, in other words, she must show that it is more likely than not that she will face persecution. *Id.* As we have observed too often for the proposition to bear repeating (were we not in the business of repeating), logic dictates that an applicant who fails to demonstrate a well-founded fear of persecution cannot establish a clear probability of persecution. *See id.*; *Krastev v. INS*, 101 F.3d 1213, 1218 (7th Cir.1996); *Man v. INS*, 69 F.3d 835, 837 (7th Cir.1995); *Mitev*, 67 F.3d at 1333; *Milosevic v. INS*, 18 F.3d 366, 372 (7th Cir.1994); *Balazoski v. INS*, 932 F.2d 638, 640 (7th Cir.1991). Recognizing that the Boykovs' petition presents no exception to this logic, we AFFIRM the order of the Board.