**UNPUBLISHED ORDER**

Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 1, 2006
Decided April 13, 2006

**Before**

Hon. FRANK H. EASTERBROOK, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 05-1562

| | |
|---|---|
| MAMADOU CIRE LO,<br>    *Petitioner*, | Petition for Review of an Order<br>of the Board of Immigration<br>Appeals |
|        *v.* | |
| ALBERTO R. GONZALES, Attorney General<br>of the United States,<br>    *Respondent*. | No. A78 638 269 |

**ORDER**

Mamadou Cire Lo, a native and citizen of Senegal, petitions for review of an order of the Board of Immigration Appeals affirming the Immigration Judge's denial of his claim for asylum, withholding of removal, and relief under the Convention Against Torture. Lo claims that he has a well-founded fear of persecution in Senegal on account of his ethnicity. Because the IJ's finding that Lo did not suffer past persecution or have a well-founded fear of future persecution is supported by substantial evidence, we deny the petition.

Lo is from the Casamance region in southern Senegal, where his father ran a store and raised livestock, apparently with some success. He is a member of the Wolof ethnic group. Although the Wolof are the largest ethnic group in Senegal

making up 43% of the population and, according to Lo they control the Senegalese government, the Wolof are a minority within the region of Casamance. In fact Lo says that his family was the only Wolof family in the Casamance town of Wassadou where he lived. At his merits hearing, Lo testified to several incidents that he argues amount to past persecution. The first occurred in 1994, when local tribal leaders from the majority ethnic groups in Casamance organized an armed gang that prevented his father's employees from loading his father's livestock onto transport trucks. When Lo's father showed up at the scene, the gang attacked him and he escaped only with the help of his employees. It appears that Lo was not actually present at this attack, having been told by his father to remain at home. Soon after this incident, the gang held a rally at the Lo family home, where they threatened Lo's family. Lo says that the local police were contacted but made no effort to help.

About three years later, while Lo was studying in Morocco, six armed, masked men robbed his father's home. Lo says that his father was beaten and injured (he does not say how), and he says that "unspeakable acts" were committed against his stepmother. The family could not identify the attackers, but the attackers told Lo's father that they were sent there by "someone who knows him." Again Lo says that the police refused to help.

After this incident Lo returned to Senegal and began working for his father's business. He discovered that many people in Casamance owed his father large debts. Lo believed that the local population was taking advantage of his father and began to collect the outstanding debts. He also refused to extend any more credit. The locals did not react well to this decision, and Lo says that during this time he received numerous death threats, including threats from at least one of the tribal leaders who organized the rally against his family in 1994. It was these death threats that motivated Lo to leave Senegal for the United States in 1999. Lo says that after he left Senegal, Casamance tribal leaders attacked and killed a friend of his family in his father's house. Lo's father also left Casamance in about 2001 and currently lives in northern Senegal.

The IJ denied Lo relief, finding that Lo had failed to corroborate his story. He also found that, even if Lo was credible, he had failed to show that his treatment qualified as persecution. The IJ pointed out that, although Lo's father was threatened and attacked, Lo never claimed that he himself was "injured, tortured or otherwise mistreated by anyone." The IJ also noted that Lo did not establish that his treatment was on account of his ethnicity rather than his efforts to collect the debts to his father. The BIA adopted and affirmed the majority of the IJ's decision.

Lo argues generally that the IJ erred in finding that the treatment he suffered did not amount to past persecution. Since the BIA adopted this part of the IJ's decision, this court reviews the IJ's decision directly, *Tabaku v. Gonzales*, 425 F.3d 417, 421 (7th Cir. 2005), and must uphold it if it is supported by substantial evidence, *Ssali v. Gonzales*, 424 F.3d 556, 561 (7th Cir. 2005). The IJ's decision is rambling and often hard to understand. Nonetheless, his finding that Lo did not suffer past persecution is supported by substantial evidence. Lo never seriously challenges the IJ's finding that the attacks he described were directed not against him personally but rather against his father. We have repeatedly refused to recognize claims of derivative persecution. *See Firmansjah v. Gonzales*, 424 F.3d 598, 605 (7th Cir. 2005); *Haile v. Gonzales*, 421 F.3d 493, 495 (7th Cir. 2005); *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003); *Ambati v. Reno*, 233 F.3d 1054, 1060 (7th Cir. 2000).

The three most serious incidents that Lo mentions are the 1994 attack on his father's livestock and the subsequent rally at the family home, the 1997 robbery and assault of Lo's father and stepmother, and the murder of a family friend. In none of these events was Lo himself physically attacked or harmed. He was not even in Senegal during the 1997 attack on his parents or the attack on the family friend. Nor does he claim to have been present when the armed gang prevented the transport of his father's livestock and attempted to attack his father in 1994. In fact he says in the statement attached to his asylum application that his father told him to remain at the house during this incident and not intervene.

The only harm that Lo personally suffered was threats. Although threats can constitute past persecution, this is true only "in the most extreme circumstances." *Mitreva v. Gonzales*, 417 F.3d 761, 764 (7th Cir. 2005). In particular, threats can amount to persecution if they are of an "immediate and menacing nature," *Boykov v. INS*, 109 F.3d 413, 415–416 (7th Cir. 1997) (threat by police that it would be easier to "get rid of" petitioner not persecution), or if the perpetrators attempt to "follow through on their threats", *Roman v. INS*, 233 F.3d 1027, 1030, 1035 (7th Cir. 2000) (threat that petitioner would have an "accident" rose above "mere harassment" because perpetrators attempted to follow through by loosening lug nuts on petitioner's car). On the other hand, vague or unfulfilled threats are generally not enough to compel a finding of past persecution. *See Ahmed v. Ashcroft*, 348 F.3d 611, 616 (7th Cir. 2003); *Boykov*, 109 F.3d at 416–17; *see also Li v. Attorney Gen. of the United States*, 400 F.3d 157, 165 (3d Cir. 2005) (unfulfilled threats, even death threats did not compel finding of past persecution unless "highly imminent"). The threats that Lo received while he was managing his father's business fall into this latter category. Lo says only that he received "death threats" and does not provide additional details that would allow us to assess their imminence. He also has not provided any evidence to suggest that the perpetrators ever attempted to follow through on these threats.

The threat to the Lo family that occurred in 1994 is arguably more serious because it was made by an armed gang outside his family's home. *See Nakibuka v. Gonzales*, 421 F.3d 473, 477 (7th Cir. 2005) (threat could constitute persecution when made while perpetrator was holding a gun to petitioner's head and had restrained her in an "excruciating" position). But this threat occurred roughly four years before the other threats made against Lo, and apparently nothing else happened to Lo in the interim. *See Marquez v. INS*, 105 F.3d 374, 379–80 (7th Cir. 1997) (concluding that long gaps between threats to petitioners, including at least one death threat, undermined inference of persecution); *Bocova v. Gonzales*, 412 F.3d 257, 263 (1st Cir. 2005) (holding that finding of persecution not compelled when petitioner suffered only two incidents of harassment in eight years occurring more than twenty-five months apart). Therefore, we do not think that this one incident is sufficient to compel a finding of past persecution.

The other incidents that Lo mentions either were not directed at Lo personally (such as an incident where Lo's father was denied medical care) or were not serious enough to compel a finding of persecution (such as an incident where the public veterinarian refused to provide a vaccine for the Los' cattle and refused to treat the Los' sick sheep). Since the evidence does not compel a finding of past persecution, Lo was not entitled to a presumption of a well-founded fear of future persecution. *Dandan v Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003).

Lo also argues that the IJ erred in finding that he did not show a well-founded fear of future persecution even without the benefit of the presumption. The IJ's decision on this point is indeed conclusory, but we do not think that the evidence compels a different result. Although Lo alleges that a family friend was killed by Casamance tribal leaders after Lo left Senegal, Lo's family has been living in northern Senegal since about 2001, and the record does not show that they have suffered any attacks since they moved. *See Toptchev v. INS*, 295 F.3d 714, 722 (7th Cir. 2002) (upholding IJ's conclusion that petitioners were not at risk of future persecution because their family members continued to live in country unharmed); *Sayaxing v. INS*, 179 F.3d 515, 522 (7th Cir. 1999) (same).

For the foregoing reasons we DENY the petition for review.