**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2255
_____

JEYDI L. HERRERA-REYES,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES of
AMERICA,
                                        Respondent
_____

On Petition for Review of
a Decision of the Board of Immigration Appeals
(BIA No. A216-587-697)
Immigration Judge: John B. Carle
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
November 13, 2019

Before: AMBRO, KRAUSE, and BIBAS, *Circuit Judges*


(Opinion filed: February 28, 2020)

Karen L. Hoffmann, Esq.
Syrena Law
128 Chestnut Street, Room 301a
Philadelphia, PA 19106
          *Attorney for Petitioner*

Katherine A. Smith, Esq.
United States Department of Justice
Office of Immigration Litigation, Room 2245
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
          *Attorney for Respondent*

————————————

**OPINION**

————————————

KRAUSE, *Circuit Judge*.

This case presents the question whether and under what circumstances threats of violence may contribute to a cumulative pattern of past persecution when not coupled with physical harm to the asylum-seeker or her family. We conclude the Immigration Judge and the Board of Immigration Appeals erred in holding that Petitioner Jeydi Herrera-Reyes— a Nicaraguan national who received death threats from members of the governing Sandinista Party after her home was burned down, a convoy in which she was traveling came under gunfire, and a political meeting she was organizing was robbed at gunpoint—had not suffered past persecution within the

meaning of the asylum statute. We will therefore grant the petition for review and vacate and remand to the BIA.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner claimed she experienced past persecution as an active opponent of the Nicaraguan government. As reflected in the record and before the IJ, that government has a "de facto concentration of power in a single party"—the Sandinistas—"with an authoritarian executive branch exercising significant control over the legislative, judicial, and electoral functions." A.R. 55 (quoting a U.S. Department of State Human Rights Report for Nicaragua). Sandinista government officials and security personnel, with widespread impunity, have imposed "arbitrary arrest and detention of suspects; . . . multiple obstacles to freedom of speech and the press, including government intimidation; . . . and partisan restrictions on freedom of peaceful assembly." *Id.* (same). In recent years, according to a report by human rights observers, "police generally protected or otherwise gave preferential treatment to progovernment [Sandinista] demonstrations while disrupting or denying registration for opposition groups" and "did not protect opposition protesters when progovernment supporters harassed or attacked them." A.R. 56.

Petitioner's experience, according to testimony the IJ deemed credible, was a case in point. Before she fled to the United States, Petitioner was the leader and president of an opposition group for Liberal Party youth and was "deeply involved" in local politics. A.R. 183. As a result, she was subjected to a pattern of threatening words and conduct that she claimed rose to the level of persecution.

3

The first occurred during the 2017 mayoral election in her town, when Petitioner was working at a polling station and armed Sandinistas gathered outside threatening to "kill" or "steal" from Petitioner and the other Liberal Party workers inside. A.R. 162. Despite this intimidation, the Liberal Party candidate won the election, but that only escalated the conflict. The same evening, while Petitioner was out celebrating the candidate's victory, Sandinistas burned down her family's home.

The following day, faced with this and other similar acts of violence, Petitioner and other Liberal Party activists traveled in a two-truck convoy to spread the word of the attacks to opposition-group colleagues in neighboring towns. But violence followed them: On their way home, Sandinistas shot at the convoy and killed the mayor-elect's nephew. And when Petitioner returned to her hometown and began preparing the local auditorium for the mayor's inauguration, armed Sandinistas attacked the gathering and stole computers and the town's radio transmitter at gunpoint.

Petitioner also learned of two attacks that had recently occurred in her provincial department in which Sandinistas ransacked Liberal Party towns and murdered or critically injured its members. Considering this news, the incidents she had witnessed, and the threats she had received to that point, Petitioner believed she "could be next," A.R. 174, and was "afraid" to leave her house because she thought "[the Sandinistas] might do something bad to [her]." A.R. 180.

Her fear intensified a few months later when Petitioner left her home to go to the supermarket and was confronted by Sandinistas who told her to "be thankful [that] there were many people there" and that they would kill her if they found her

4

alone because her political advocacy had caused them to lose the mayoral election. A.R. 180–81. At that point, Petitioner concluded she would be killed for her leadership role in the Liberal Party if she stayed in the country and that she "had no other alternative" but to flee Nicaragua. A.R. 181. Even after she left, Sandinistas repeatedly visited her family's home demanding to know where she had gone.

Petitioner arrived in the United States the following month and filed a claim for political asylum, alleging she had been subjected to past persecution and thus was entitled to a presumption of future persecution necessary to establish an asylum claim. The evidence consisted primarily of her testimony. Of the three elements of a claim of past persecution—"(1) an incident, or incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control," *Sheriff v. Att'y Gen.,* 587 F.3d 584, 589 (3d Cir. 2009) (internal quotation marks and citation omitted)—there was no dispute that the latter two were satisfied. The Government did not dispute that Petitioner was targeted on account of her political opinion, *see* 8 U.S.C. § 1101(a)(42), or by members of the ruling Sandinista Party, *see Shardar v. Att'y Gen.*, 503 F.3d 308, 311, 318 (3d Cir. 2007) (finding that the petitioner made out a prima facie case for asylum where he was menaced by the "ruling party").

As to the first prong, however, the IJ concluded that Petitioner's experiences did not "rise to the level of past persecution." A.R. 53. Although he did "not doubt [Petitioner's] support of the Liberal party and her subjective fear of returning to Nicaragua as a result of her political opinion," A.R. 52, the IJ held as a matter of law that Petitioner

5

was not "persecuted" because she "was never physically harmed," "never arrested or imprisoned by authorities," and "[n]ever threatened by a government official." A.R. 53–54, 56. Acknowledging the truck-convoy shooting was "harrowing" and the threats were "not insignificant," the IJ deemed them insufficient, because they were "not so menacing as to cause actual physical suffering or harm." A.R. 53.

The BIA adopted the IJ's analysis and likewise held that Petitioner's experiences did not constitute "past persecution." A.R. 3. Citing precedent in which we described threats sufficient to constitute "persecution" as "sufficiently imminent," "concrete," and "menacing," the BIA likewise concluded "the threats [she] faced here were [not] so menacing as to cause significant actual suffering or harm." A.R. 4 (citing *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 343 (3d Cir. 2008)). Herrera-Reyes timely petitioned for review.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over Herrera-Reyes's petition for review of her final order of removal under 8 U.S.C. § 1252(a)(5), and the "final order we review is that of the BIA." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001) (internal quotation marks omitted). "Because here 'the BIA adopted and affirmed the IJ's decisions and orders as well as [conducted] an independent analysis, we review both the IJ's and the BIA's decisions and orders.'" *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 543 (3d Cir. 2018) (quoting *Ordonez-Tevalan v. Att'y Gen.*, 837 F.3d 331, 340–41 (3d Cir. 2016)). We look to the IJ's opinion "where the BIA has substantially relied on that opinion." *Id.* (quoting *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009)).

While we review for substantial evidence the BIA's factual findings, *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), we review the BIA's legal determinations de novo, "including both pure questions of law and applications of law to undisputed facts," *Rranci v. Att'y Gen.*, 540 F.3d 165, 171 (3d Cir. 2008). Neither party disputes the facts underlying Petitioner's past-persecution claim. So we will review the BIA's application of our past-persecution standard to those facts de novo.

## III. DISCUSSION

The IJ and BIA erred when they held that the threats experienced by Petitioner did not meet our standard for past persecution. By finding it dispositive that Petitioner "was never physically harmed," A.R. 53, and "the threats [she] faced here were [not] so menacing as to cause significant *actual* suffering or harm," A.R. 4 (emphasis added), the IJ and BIA treated our approach to unfulfilled threats as an exception to the general rule that incidents of alleged past persecution must be considered cumulatively. And by purporting to ground that treatment in cases where we described threats as "imminent [or] concrete" and "menacing," A.R. 4, the IJ and BIA suggested the test for persecution in a threat case is different from the one used in other persecution cases. *See* A.R. 4 (citing *Gomez-Zuluaga*, 527 F.3d at 343); A.R. 53 (citing *Chavarria v. Gonzalez*, 446 F.3d 508, 518 (3d. Cir. 2006), and *Zhen Hua Li v. Att'y Gen.*, 400 F.3d 157, 164–65 (3d Cir. 2005)). Neither proposition is supported by our precedent.

We first review our threat cases in the context of our past persecution case law. We then examine how the BIA's misconception of our threat cases resulted in two legal errors. And finally, correcting for those errors, we turn to the

7

implications of our case law for the proper disposition of this case.

**A. Our Threat Cases in the Context of Broader Precedent**

As a general matter, we have described "persecution" as including "treatment like death threats, involuntary confinement, [and] torture" that rises to the level of a "severe affront[] to the life or freedom of the applicant." *Gomez-Zuluaga*, 527 F.3d at 341. To determine whether a set of experiences rises to the level of a "severe affront[] to the life or freedom of the applicant," *id.*, the "cumulative effect of the applicant's experience must be taken into account because [t]aking isolated incidents out of context may be misleading." *Fei Mei Cheng v. Att'y Gen.*, 623 F.3d 175, 192 (3d Cir. 2010) (alteration in original) (internal quotation marks and citation omitted). "[M]istreatment amount[ing] to persecution" may be "actual or threatened," and "[e]ven if one incident of mistreatment is not, in and of itself, severe enough to constitute persecution, a series of incidents of physical or economic mistreatment could, taken together, be sufficiently abusive to amount to persecution." *Id.* at 192–93. Pursuant to this principle, each incident must be "weigh[ed] . . . in conjunction with . . . prior incidents," *Toure v. Att'y Gen.*, 443 F.3d 310, 318 (3d Cir. 2006), and "assessed within the 'overall trajectory of the harassment,'" *Fei Mei Cheng*, 623 F.3d at 193 (quoting *Gomez-Zuluaga*, 527 F.3d at 343).

We have had three occasions to consider the significance of threats in making that assessment. The first was *Zhen Hua Li v. Attorney General*, where we considered whether verbal threats, "standing alone," constituted past persecution. *See* 400 F.3d at 164–65. In that case, government

8

officials threatened that the petitioner would be captured and beaten for violating China's one-child policy. *Id.* at 164. As a threshold matter, we noted that this threat was "unfulfilled" because the petitioner was never actually captured or beaten. *Id.* We then observed that, to constitute past persecution, unfulfilled threats must be "of a highly . . . menacing nature" as well as "sufficiently imminent or concrete," *id.* at 164–65 (citing *Boykov v. INS*, 109 F.3d 413, 416–17 (7th Cir. 1997)), and that the threat in that case—uncorroborated by the surrounding circumstances—fell short: "neither [petitioner] nor any of [his] family members were actually . . . physically harmed," and petitioner's only evidence that the threat was more than bluster was that one worker at a neighboring factory had allegedly been arrested and beaten for violating the one-child policy. *Id.*

By contrast, in *Chavarria v. Gonzalez*, the petitioner did suffer past persecution when he was threatened within the surrounding context of violent conduct. 446 F.3d at 519–20. An initial incident in which paramilitary troops simply surveilled the petitioner's home was not a "concrete and menacing" threat, *id.*, but that threshold was crossed when armed men forced the petitioner into a car, robbed him at gunpoint, and threatened to kill him if they ever saw him again. *Id.* at 520. Together, these experiences constituted past persecution because the petitioner had not experienced a "merely verbal" threat but a threat that, in the context of the surrounding mistreatment, was sufficiently substantiated for petitioner to "suffer[] harm." *Id.* We described a threat meeting that threshold as "concrete and menacing." *Id.*

In our third threat case—*Gomez-Zuluaga v. Attorney General*—we built on *Chavarria* to hold that a threat was sufficiently concrete and menacing when substantiated by both

9

contemporaneous physical violence and by the petitioner's previous encounters with her persecutors. *See* 527 F.3d at 342–34. The first two incidents—during which guerrillas verbally threatened the petitioner at gunpoint during a "brief" detention, the petitioner "was not physically injured or robbed," and "the guns were [not] brandished or used in . . . [a] threatening manner," *id.* at 342—were "more similar to the situation in *Li*, where the threats were oblique and not imminent, and the petitioner was not appreciably harmed." *Id*. But the third and final incident—in which the petitioner was abducted, confined for eight days while blindfolded and bound, and threatened repeatedly—did rise to the level of persecution. *Id*. Taking into account both the contemporaneous abduction and the previous threats and looking to the "overall trajectory of the harassment against [the petitioner]," we held the final threat sufficiently "concrete and menacing" to constitute past persecution. *Id*. at 342–43.

From *Chavarria*, *Zhen Hua Li*, and *Gomez-Zuluaga,* we draw three lessons. First, our threat cases are not an exception to the general rule of cumulative analysis but simply applications of it. In *Zhen Hua Li*, the lack of any corroborating harm to the petitioner or those close to him generally was dispositive, 400 F.3d at 165; in *Chavarria*, the threat was made concrete by the violent context in which it occurred, 446 F.3d at 520; and in *Gomez-Zuluaga*, the final threat was substantiated by the "overall trajectory" of the petitioner's mistreatment, 527 F.3d at 343.

Second, in evaluating whether a threat within that "overall trajectory" suffices to establish persecution, we consider whether the threat is "concrete" and "menacing." True, we have sometimes used the phrase "highly imminent, concrete *and* menacing," *Chavarria*, 446 F.3d at 520

10

(emphasis added), but more frequently we have used the terms "concrete" and "imminent" interchangeably or in the disjunctive—describing a threat amounting to persecution as "menacing" and "sufficiently imminent *or* concrete," *Zhen Hua Li*, 400 F.3d at 164–65 (emphasis added); *Gomez-Zuluaga*, 527 F.3d at 341 (emphasis added). And on inspection, that is with good reason: "Imminence" is a misnomer here. We have neither required that the threat portend immediate harm nor that it be in close temporal proximity to other acts of mistreatment. *See infra* Section III.B.2. Indeed, our interest is not the imminence of the threat at all, but rather the likelihood of the harm threatened—a concept subsumed in the inquiry as to whether the threat is "concrete." We therefore refer to the standard going forward simply as "concrete and menacing."

Third, our cases teach that "concrete and menacing" is not a unique persecution standard for threat cases, but rather a term that reflects the court's ultimate determination that the cumulative effect of the threat and its corroboration presents a "real threat to [a petitioner's] life or freedom," *Chang v. INS*, 119 F.3d 1055, 1066 (3d Cir. 1997). A threat is "concrete" when it is "not abstract or ideal," *Concrete*, Merriam-Webster Unabridged, https://unabridged.merriam-webster.com/unabridged/concrete (last visited Feb. 5, 2020), but is corroborated by credible evidence, *see, e.g.*, *Gomez-Zuluaga*, 527 F.3d at 343 (finding a threat corroborated by "[t]he overall trajectory of the harassment against [the petitioner]"). And a threat is "menacing" where it "show[s] . . . intention to inflict harm," *see Menace*, Merriam-Webster Unabridged, https://unabridged.merriam-webster.com/unabridged/menace (last visited Feb. 5, 2020). *See, e.g.*, *Chavarria*, 446 F.3d at 520 (finding a threat

11

"menacing" because the petitioner was threatened with death at gunpoint). Thus, a threat is "concrete and menacing," constituting past persecution, where the aggregate effect of a petitioner's experiences, including or culminating in the threat in question, placed a petitioner's life in peril or created an atmosphere of fear so oppressive that it severely curtailed the petitioner's liberty. In short, a threat that is "concrete and menacing" is simply one that—considered in the context of the full record—poses a "severe affront[] to the [petitioner's] life or freedom." *Gomez-Zuluaga*, 527 F.3d at 341.

With these principles in mind, we turn now to the analyses of the IJ and BIA.

## B. The Agency's Legal Errors

We conclude the IJ and BIA misapplied our precedent in two respects: First, although they purported to consider the incidents "cumulatively," A.R. 3, 53, in practice they evaluated the threats to Petitioner in isolation and without accounting for the broader campaign of intimidation, harassment, and violence substantiated by the record; second, they treated the absence of physical harm to Petitioner herself as fatal to her claim without acknowledging the significance of violence to Petitioner's property and close associates.[1]

---

[1] While we sometimes accord *Chevron* deference to the BIA's interpretation of statutory terms, *see, e.g.*, *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 542 (3d Cir. 2018), we do not where, as here, the BIA's opinion is "unpublished, non-precedential[, and] issued by a single BIA member," *Mahn v. Att'y Gen.*, 767 F.3d 170, 173 (3d. Cir. 2014); and the government concedes as much. In this case, moreover, the BIA based its threat analysis

1. The IJ and BIA Failed to Consider the Aggregate Effect of Petitioner's Mistreatment.

Both the IJ and BIA failed to give the proper weight to the cumulative effect of Petitioner's experiences. The IJ's analysis began by considering the incidents one at a time and concluding that none of the incidents, standing alone, rose to the level of past persecution. First, the IJ, without elaboration, concluded that the Sandinistas' burning of Petitioner's family's home, although "a terrible loss," did not "rise[] to a level of persecution." A.R. 53. The IJ then considered the incident in which the Sandinistas shot Petitioner's convoy and killed her compatriot and determined that, because this incident was a "physical attack that d[id] not result in serious injury" to Petitioner, it was not past persecution. *Id*. With respect to the verbal threats Petitioner received—including the final incident in which Sandinistas threatened to kill her at the grocery store—the IJ purported to consider the record "cumulatively," but concluded that because "[s]he was never physically harmed" and the threats "were not so menacing as to cause actual physical suffering or harm," these too did not amount to past persecution. *Id*.[2]

exclusively on our precedent—a body of authority we create and are well qualified to interpret.

[2] The IJ also relied on the fact that Petitioner was "[n]ever threatened by a government official or anyone other than Sandinista citizens who were in disagreement with her over her political beliefs." A.R. 54. But persecution includes mistreatment by both the government and "forces the government is either unable or unwilling to control." *Sheriff*, 587 F.3d at 589 (internal quotation marks and citation omitted).

That was not a faithful application of our cumulative approach to past persecution. Even if the IJ was correct that no single incident in isolation rose to the level of past persecution, he was still required to analyze whether the cumulative effect of these incidents constituted a severe "threat to life or freedom." *Fei Mei Cheng*, 623 F.3d at 192–93 (citation omitted). A cursory invocation of the word "cumulative" is insufficient. By finding it dispositive that Petitioner herself "was never physically harmed" and "never arrested or imprisoned," A.R. 53–54, and by failing to factor in the cumulative effect of the destruction of Petitioner's home, the shooting of her convoy, the murder of her political compatriot, the armed robbery of the inauguration preparations, and the verbal death threat, the IJ erred.

The BIA similarly erred. It endorsed the IJ's approach, finding no erroneous conclusions of law or findings of fact and agreeing that Petitioner did not experience past persecution. Like the IJ, the BIA professed to have considered Petitioner's experiences "cumulatively," A.R. 3, but did not acknowledge or even discuss how the various instances of mistreatment together might substantiate the threats and constitute past persecution. Instead, it summarily concluded that "these events were [not] so extreme as to rise to the level of past

---

Here, the record is replete with undisputed facts showing the Nicaraguan government cannot or will not control the Sandinistas. *E.g.*, A.R. 55–56. So on de novo review, for the reasons explained below, we conclude that Petitioner was mistreated by forces the Nicaraguan government cannot control. Indeed, the Government here concedes as much by failing to dispute that Petitioner's persecutors met this requirement.

14

persecution." *Id*. The BIA, like the IJ, thus paid lip service to our cumulative approach, but determining past persecution requires more than considering whether individual incidents are sufficiently "extreme"; it requires meaningful consideration of whether their aggregate effect poses a "severe affront[] to the [petitioner's] life or freedom," *Gomez-Zuluaga*, 527 F.3d at 341. Petitioner's experiences did not receive that consideration here.

2. Persecution Can Be Established Without Physical Harm to Petitioner.

The agency's second error flows from its first: In failing to look to the surrounding context of the threat, the IJ and BIA placed undue emphasis on whether Petitioner herself experienced physical harm and found its absence fatal to her claim. *See* A.R. 4 (BIA opinion) (finding that the death threat Petitioner received was insufficiently menacing because Petitioner did not experience the same physical violence as the petitioner in *Gomez-Zuluaga*); A.R. 53 (IJ opinion) (finding no past persecution because, although Petitioner "faced some threats," she "was never physically harmed"). That was contrary to our case law.

We have never reduced our persecution analysis to a checklist or suggested that physical violence—or any other single type of mistreatment—is a required element of the past persecution determination. Instead, we have approached asylum claims on a case-by-case basis and engaged in a fact-specific analysis to determine whether a petitioner's cumulative experience amounts to a "severe affront[] to [that petitioner's] life or freedom," *Gomez-Zuluaga*, 527 F.3d at 341. Neither our "concrete and menacing" standard for when verbal threats constitute past persecution nor our other

15

persecution law suggests physical violence to the petitioner is a prerequisite to a finding of past persecution. To the contrary, both make clear it is not.[3]

In evaluating whether a threat is "concrete and menacing" in the absence of physical harm to a petitioner, we have considered more broadly whether surrounding acts of mistreatment had corroborated that threat with the ultimate effect of placing the petitioner's life or liberty in peril. *See, e.g.*, *Gomez-Zuluaga*, 527 F.3d at 342–43. We have not required there to be physical harm when the petitioner is threatened with imminent violence, *see, e.g.*, *Chavarria*, 446 F.3d at 519–20 (finding a threat concrete and menacing where the petitioner was forced into a car and threatened at gunpoint but not physically injured), or that there be a threat that physical harm will be inflicted in the immediate future, *see, e.g.*, *id.* (finding armed men's threat that they would kill petitioner if they "ever ca[ught] [him] again" concrete and menacing). And we have not insisted that all surrounding mistreatment be in close temporal proximity to the verbal threat. *See, e.g.*, *Voci v. Gonzales*, 409 F.3d 607, 614 (3d Cir.

---

[3] Our sister circuits have likewise recognized that verbal threats substantiated by other kinds of mistreatment may be sufficient. *See, e.g.*, *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1009 (11th Cir. 2008) ("[W]e have not required serious physical injury where the petitioner demonstrates repeated threats combined with other forms of severe mistreatment."); *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 348, 349 n.8 (5th Cir. 2006) (holding that the petitioner was persecuted when threats were "considered in context" and noting that "physical harm is not always a requirement for asylum").

2005) (finding that verbal threats to the petitioner and his family unaccompanied by physical violence contributed to a pattern of persecution when those threats were made credible by separate incidents of physical violence to the petitioner). Nor have we limited that mistreatment to physical as opposed to, for instance, economic harm. *See, e.g.*, *Fei Mei Cheng*, 623 F.3d at 193–95 (finding past persecution where the petitioner experienced a pattern of "escalating and consummated threats" involving both verbal threats and the seizure of her family farm). And while past mistreatment of a petitioner or her property may be sufficiently corroborative and substantiating, depending on the facts of the case, *e.g., Gomez-Zuluaga*, 527 F.3d at 342–43 (previous threats of violence), so too may be mistreatment of a petitioner's family members, *e.g.*, *Camara v. Att'y Gen.*, 580 F.3d 196, 204–05 (3d Cir. 2009) (threats corroborated by the "forcible seizure and removal" of the petitioner's father); *Fei Mei Cheng*, 623 F.3d at 193–95 (threats corroborated by economic sanctions of the petitioner's family).

As relevant to this case and as logically flows from this precedent, physical harm to a petitioner's close associates may also, in combination with verbal threats, establish past persecution. This harm—no less than destruction of personal property and physical or economic harm to a petitioner's family—can contribute to an overall experience of past persecution by rendering verbal threats "concrete and menacing," establishing a "severe affront[] to the [petitioner's] life or freedom," *Gomez-Zuluaga*, 527 F.3d at 341–42; *see Tamara-Gomez v. Gonzales*, 447 F.3d 343, 346, 348–49 (5th Cir. 2006) (finding that a petitioner suffered past persecution when verbal threats were corroborated by the murders of his compatriots); *see also Caushi v. Att'y Gen.*, 436 F.3d 220, 227

17

(3d Cir. 2006) (finding that "the violence, intimidation, and assassinations" directed at the petitioner's political party contributed to his experience of past persecution); *Li Wu Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001) (finding that the government's attempt to arrest the petitioner was more likely to be political persecution because his fellow student activists "were beaten, incarcerated, and subjected to forced labor 'for their student movement activities'").[4]

In sum, the IJ and BIA erred in failing to meaningfully consider the combined effect of the incidents in the record and in conditioning a finding of past persecution based on verbal threats on a showing of physical violence to Petitioner. When a petitioner has suffered a pattern of conduct that includes threats that are "concrete and menacing" because they are substantiated by physical or economic harm to herself, her family, her property, *or* those in a close relationship to her, the cumulative effect of that conduct "constitute[s] a real threat to life or freedom," *Chang*, 119 F.3d at 1066, and she has suffered past persecution.

---

[4] Our decision in *Zhen Hua Li* is not to the contrary. In that case, we found that petitioner had received unfulfilled threats that did not rise to the level of past persecution despite the petitioner's testimony that someone in his community who engaged in the same activity as the petitioner had been arrested and beaten for this conduct. *Zhen Hua Li*, 400 F.3d at 164. But the petitioner in that case did not actually witness the mistreatment; he only had anecdotal knowledge of it. *Id.* And the alleged harm did not befall anyone with whom the petitioner was closely associated, but merely someone in his community. *Id.*

## C. Application to Petitioner's Case

Applying our case law to the undisputed facts here, Petitioner suffered past persecution.

Considered within the entire context of Petitioner's experience, the Sandinistas' threat to Petitioner that they would murder her if she were ever caught alone was undoubtedly "concrete and menacing." That context included the Sandinistas' verbal threats to Petitioner while she was volunteering at a polling table on the day of the election; the burning of her family's home after the election; the shooting of her convoy and the murder of her close compatriot, the mayor's nephew; and the robbery of her workspace at gunpoint while she was preparing for the mayor's inauguration. These incidents, like those in *Gomez-Zuluaga*, 527 F.3d at 342–43, and *Fei Mei Cheng*, 623 F.3d at 193–95, reflect an escalating pattern of mistreatment toward both Petitioner herself and the other local leaders of the Liberal Party that placed Petitioner in a constant state of oppressive fear and that culminated in the final death threat she received in the supermarket.

We need not decide whether those prior incidents, individually or collectively, would suffice to establish persecution because the final death threat, considered in that context, surely did. That death threat to Petitioner was "concrete" because it was substantiated by a pattern of harassment encompassing property damage, threats of violence, and actual violence; and it was "menacing" because the Sandinistas' murder of her political compatriot showed Petitioner that they were willing and able to add murder to the abuse they inflicted on her. The pattern of incidents, in other words, constituted a "severe affront[] to . . . life or freedom," *Gomez-Zuluaga*, 527 F.3d at 341.

19

\* \* \*

Because Petitioner was subjected to past persecution, she was entitled to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). But as the IJ erroneously found to the contrary and the BIA affirmed, neither determined whether the presumption of future persecution could be rebutted, and that determination lies with the agency in the first instance. *See id*. § 208.13(b)(1)(i). We will therefore grant Herrera-Reyes's petition, vacate the BIA's order below, and remand to the agency for further proceedings consistent with our opinion.[5]

---

[5] We will also vacate the BIA's order affirming the denial of Petitioner's CAT claim for the "reasons provided in [the IJ's] decision." A.R. 5. The IJ erred in failing to consider and discuss why the record did not suffice to establish the element of government acquiescence as we have required. *See Myrie v. Att'y Gen.*, 855 F.3d 509, 517–18 (3d Cir. 2017). Although the record here demonstrates that government officials routinely acquiesce in severe mistreatment of political opponents, the IJ simply stated that Petitioner failed to "present[] persuasive evidence that the government of Nicaragua would consent, acquiesce or exercise willful blindness to any hypothetical torture." A.R. 64. In addition, in concluding that Petitioner had not "suffered past 'severe physical or mental pain or suffering'" and failed to demonstrate a greater than fifty percent likelihood of torture upon removal, the IJ appears to have relied, at least in part, on his observation that Petitioner "lived without harm or threat in Nicaragua in December of 2017 up to April of 2018 and only faced on[e] verbal threat in April shortly before her departure." A.R. 63–64. As with the IJ's asylum analysis, this

explanation misses the mark to the extent the IJ considered this fact in isolation and without accounting for its significance in context. Specifically, the IJ's analysis does not acknowledge Petitioner's credible testimony that she was afraid to leave her house during that period due to the escalating pattern of threats and violence and that when she did leave the house at the end of that period, she received the death threat that prompted her to finally flee the country. On reconsideration of Petitioner's CAT claim on remand, the agency should consider the record in its entirety and in context and should provide the explanation required for the decision it ultimately reaches.