**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3374
_____

LENIN GERARDO SILVA VEGA,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(No. A216-430-387)
Immigration Judge: Mirlande Tadal

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
on June 25, 2021

Before: GREENAWAY, JR., KRAUSE, and BIBAS, <u>Circuit Judges</u>

(Opinion filed: July 30, 2021)

_____

———————

OPINION[*]

———————

PER CURIAM

Lenin Gerardo Silva Vega seeks review of a final removal order of the Board of Immigration Appeals ("BIA"), dismissing his appeal from the Immigration Judge's ("IJ's") denial of his applications for relief. For the reasons that follow, we will dismiss the petition for review in part and deny it in part.

In 2016, Silva Vega, a citizen of Colombia, arrived in the United States as a non-immigrant visitor. In August 2019, the Government charged him with removability under 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States longer than permitted. Through counsel, Silva Vega conceded the charge but applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). On the due date for submitting evidence before his hearing, Silva Vega filed a motion for a continuance to obtain and submit declarations from family members, an expert report on country conditions, and a report concerning a potential psychological evaluation. The IJ denied the motion, stating the lack of availability for a hearing within a reasonable time frame. Silva Vega later obtained and submitted additional declarations from family, along with a motion to accept untimely filing; the IJ accepted the evidence at the hearing.

———————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

Silva Vega testified as the sole witness. He stated that for most of his childhood, he did not have a relationship with his biological father, Milton Silva Algodelo, who was a member of the FARC guerilla group. He first met his father when he was nine or ten years old, when his father summoned his family to meet him for several days at a remote jungle location. After that, Silva Vega stated that he only saw his father on television during Colombia's peace negotiations with the FARC. Silva Vega testified regarding local violence in 1999 involving the FARC, the police, and the army. His family received threats and their house was burned down due to their link to his father. In 2000, his family was displaced by the violence, and they relocated to another city, Villavicencio. Around that time, his mother was pressured to allow Silva Vega to join the paramilitary group AUC, to demonstrate the family's lack of connection to the FARC. The family reported the threat and received some government assistance.[1]

After completing high school, Silva Vega served in the Colombian military in 2006-2007, engaging in battles with guerilla groups and paramilitary groups. The AUC again attempted to recruit him, but he left town; he again reported the incident. In 2008, Silva Vega went to college. He started a family of his own and began working at a bank. He relocated to another town, Granada, for his bank job. The AUC sent him a threatening letter to drive him out of Granada, but he later received assurances from the AUC commander that he may remain. About two months later, he received a call of unknown origin, warning

---

[1] Silva Vega submitted evidence showing his placement on the Colombia National Registry of Victims of the Colombian armed conflict, along with a report from the Victim Services and Compensation Unit that shows the recorded dates of Silva-Vega's forced displacements and threats between 2000-2015. (A.R. 267-281.)

him to leave because his life was in danger. The bank helped him transfer back to Villavi-cencio.

In 2014-2015, during restarted negotiations between the FARC and the Colombian government, Silva Vega saw his father on television as a FARC leader in the negotiations. He began communicating with his father through Facebook. Silva Vega believed that intelligence officials began monitoring their contacts and that members of the military began following him. He received a threat and reported it to the government assistance agency. He then obtained a tourist visa and came to the United States in 2016, believing that his life was in danger. Since being in the United States, he has not received threats, but he believed that his family's communications were being monitored. His son's mother and their son left Colombia in 2017 to live in Mexico.

Silva Vega testified that because of the peace negotiations, his father faced legal ramifications and agreed to a number of terms, such as renouncing FARC membership and assisting the Colombian government as an informant regarding other FARC members and cocaine manufacturing locations. He stated that his father receives protection from the Colombian government due to threats from FARC members who decline to demobilize. Silva Vega stated that his brother in Colombia has received threats, but neither he nor his sister has, because they are in the United States. He stated that he feared being targeted for murder or torture by FARC members or paramilitary groups linked to drug dealers, because those groups would try to benefit from his military training and use his influence to keep his father from being an informant. Silva Vega also stated that he feared the Colombian government due to continuing in-fighting and because of his ties to his father. Believing

4

that he would not receive any government protection due to corruption, Silva Vega left Colombia.

Silva Vega acknowledged that his mother and siblings remain in Colombia, including his father's other sons, though they do not have his father's last name. His father also lives in Colombia and is a member of the political party formed by FARC members. Silva Vega explained that his father did not write a statement in support of his asylum application because his father did not wish to compromise his ideology and did not agree with his son being in the United States.

After Silva Vega's testimony, the IJ and counsel for both parties discussed the lack of evidence showing communication between Silva Vega and his father, or showing that his father, Milton Silva Algodelo, is the same person as Fidel Rondon,[2] a publicly known member of the FARC. The parties also discussed the IJ's earlier denial of a continuance to obtain further documentation.

The IJ denied relief and ordered Silva Vega to be removed to Colombia. Initially, the IJ concluded that Silva Vega's asylum application was untimely, as it was filed more than one year after Vega entered the United States, and Vega had not shown a change in country conditions or changed circumstances for an exception to the deadline to apply. Addressing the withholding and CAT claims, the IJ found Silva Vega to be credible but concluded that he failed to demonstrate that the harm he suffered amounted to persecution, noting that he

---

[2] The IJ refers to "Fidel Rodan," the name transcribed from the hearing. Silva Vega's I-589 Application for Asylum and for Withholding of Removal, and supporting exhibits, pertain to Fidel Rondon, member of FARC's peace delegation. (See, e.g., A.R. 290, 434-45.)

and his family were able to relocate when displaced by violence, with assistance from a government agency. And, although Silva Vega received threats from the AUC to join them, he and his family members successfully resisted those recruitment efforts. The IJ also ruled that Silva Vega failed to show an objectively reasonable fear of future persecution, given the lack of record evidence that the Colombian government, FARC rebel factions, or paramilitary groups would target him for harm. The IJ also noted that Silva Vega had not shown that he would not be able to relocate within Colombia, given that his immediate family members—including brothers on his father's side—continue to live in Colombia without harm.

Further, the IJ found that, even if Silva Vega had shown past persecution, he did not establish that the harm was account of political opinion or based on membership in particular social groups—namely, immediate family members of Fidel Rondon (Milton Silva), immediate family members of a former FARC member, and former Colombian military. The IJ also concluded that the claimed social groups lacked cognizability, because (1) Silva Vega had not established Milton Silva's alternate identity as Fidel Rodan for showing that society views his family as a distinct group; (2) former FARC members' families was not a cohesive group; and (3) former military members was overly broad as a group. Regarding Silva Vega's CAT claim, the IJ found that Silva Vega was never physically harmed in Colombia by the FARC or the Colombian government, and he had not shown that the Colombian government would torture him or that it would acquiesce to any torture based due to ties with his father, noting that the government was providing his father with protection.

6

On appeal, the BIA affirmed and adopted the IJ's decision. The BIA also concluded that no prejudice occurred from the IJ's denial of a continuance, noting that Silva Vega had not submitted nor alleged the existence of any further evidence to warrant a remand.[3]

We have jurisdiction to review final orders of removal. See 8 U.S.C. § 1252(a)(1). However, to the extent that Silva Vega challenges the IJ's ruling that his asylum application was untimely because he failed to meet the change in circumstances exception to the one-year deadline, under 8 U.S.C. § 1158(a)(3), we lack jurisdiction to review that determination. Challenges to the agency's decision as to whether to excuse an untimely filing are unreviewable absent a constitutional claim or a question of law; Silva Vega raises none here. See Sukwanputra v. Gonzales, 434 F.3d 627, 633–35 (3d Cir. 2006).

To the extent that we have jurisdiction, we review the agency's findings of fact for substantial evidence, considering whether the findings are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Balasubramanrim v. INS, 143 F.3d 157, 161 (3d Cir. 1998) (internal quotation marks and citation omitted). The decision must be affirmed "unless the evidence not only supports a contrary conclusion, but compels it." Zubeda v. Ashcroft, 333 F.3d 463, 471 (3d Cir. 2003) (internal quotation marks and citation omitted). The same standard applies to factual challenges to CAT orders. Nasrallah v. Barr, 140 S. Ct. 1683, 1692 (2020).

To succeed on his claim for withholding of removal, Silva Vega had to establish that his "life or freedom would be threatened" in Colombia because of his race, religion,

---

[3] Silva Vega asserts that he since has obtained additional unspecified evidence, but we cannot consider material outside of the administrative record. See 8 U.S.C. § 1252(b)(4).

nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1231(b)(3). The burden of proof for a withholding of removal claim is a "clear probability" that the applicant's life or freedom would be threatened in the proposed country of deportation. See Tarrawally v. Ashcroft, 338 F.3d 180, 186 (3d Cir. 2003). As for his CAT claim, Silva Vega had to establish that he is "more likely than not" to be tortured "by or at the instigation of or with the consent or acquiescence of" a Colombian public official if he were to return to Colombia. 8 C.F.R. § 1208.16(c)(2); § 1208.18(a)(1); Sevoian v. Ashcroft, 290 F.3d 166, 174–75 (3d Cir. 2002).

Silva Vega argues that the IJ erred in finding that he had failed to show that a cognizable particular social group or political opinion formed the basis of his claims for relief. Yet because substantial evidence supports the finding that Silva Vega did not show that he was or will be harmed due to his membership in such a group, we need not resolve that dispute here. See Gomez-Zuluaga v. Att'y Gen., 527 F.3d 330, 340–45 & n.10, 348 (3d Cir. 2008) (discussing burden of proof for asylum and withholding of removal and finding it unnecessary to decide whether a particular social group was cognizable).[4] The IJ considered the sum of Silva Vega's history, including his family's displacement by local violence when he was a child, the sporadic threats from the AUC and his family's ability to resist the group, his ability to relocate within Colombia, and his family's current ability to reside safely in Colombia. Considering the aggregate effect of his experiences, including the

---

[4] We have encouraged the IJ and BIA to decide the cognizability of a particular social group before addressing the nexus requirement. See Serrano-Alberto v. Att'y Gen., 859 F.3d 208, 219 n.5 (3d Cir. 2017).

impact to his family, Silva Vega did not show that he suffered any harm rising to the level of past persecution. See Herrera-Reyes v. Att'y Gen., 952 F.3d 101, 108 (3d Cir. 2020) (describing when a threat, viewed in context of the record, is sufficiently "concrete and menacing" to constitute past persecution). Silva Vega states that he fears returning to Colombia because FARC members opposing the peace agreement view his father as a traitor, and because the Colombian government may harm his father if his father fails to comply with its terms. Yet he does not point to any evidence to compel a conclusion that he, personally, is a target for harm on any of his asserted bases, or that he has shown a "clear probability" of persecution if he returned to Colombia. For similar reasons, to the extent that Silva Vega's CAT claim is premised on the same asserted fears, the agency's decision is supported by substantial evidence, and he points to no evidence that compels a finding in his favor.

Silva Vega also asserts that the IJ erred in denying his motion for a continuance. An IJ's refusal to grant a continuance is reviewed for abuse of discretion, Khan v. Att'y Gen., 448 F.3d 226, 233 (3d Cir. 2006), and will be overturned only if the decision is arbitrary, irrational, or contrary to law, see Hashmi v. Att'y Gen., 531 F.3d 256, 259 (3d Cir. 2008). To the extent that Silva Vega argues that the denial of a continuance violated his Fifth Amendment due process rights, he must show that the IJ prevented him from presenting his case or that he suffered prejudice as a result. See Khan, 448 F.3d at 235–36. He contends that the IJ denied relief primarily due to the lack of corroborating evidence from his father, but the IJ's rejection of his claims did not rest on that basis. The IJ generally accepted Silva Vega's testimony and declarations concerning Silva Vega's father's FARC

9

affiliation and participation in the peace negotiations. Instead, the IJ's determination rested on the lack of evidence showing that Silva Vega was a past or future target for harm. Moreover, Silva Vega testified that his father was unwilling to provide a statement because he believed that doing so would compromise his ideology, and the agency determination would have been the same even if Silva Vega presented corroborating evidence from his father. Thus, Silva Vega does not show that the denial of a continuance constituted an abuse of discretion or had any prejudicial impact on his case.

We have considered Silva Vega's arguments and conclude that they do not warrant relief. Accordingly, we will dismiss the petition for review to the extent that we lack jurisdiction over it, and we will otherwise deny it.